IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

ORVILLE GREEN,

              Petitioner,

v.                                            Case No.: 3:02-cv-1348

DAVID BALLARD, Warden,[1]
Mount Olive Correctional Complex

          Respondent.

PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court are Petitioner's *pro se* Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 2), and Respondent's Motion to Dismiss and Motion for Summary Judgment. (ECF No. 7).[2] This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). As a preliminary matter, the undersigned notes that the record before the

---

[1] David Ballard replaced Thomas McBride as the warden of Mount Olive Correctional Complex, where Petitioner is incarcerated. Pursuant to Federal Rule of Civil Procedure 25(d), David Ballard will be substituted as Respondent in this case.

[2] Petitioner has filed a host of other motions during the pendency of his federal habeas corpus petition seeking damages and other relief from the state of West Virginia, Wayne County, the justices of the West Virginia Supreme Court of Appeals, the Wayne County Prosecutor's Office, the trial judges, and his trial, appellate, and state habeas attorneys. (ECF Nos. 60, 62, 65, 70, 71, & 72). Subsequently, Petitioner filed a motion to "void" (withdraw) these motions without prejudice. (ECF No. 73). All of the motions have been referred to the undersigned. Accordingly, the undersigned **RECOMMENDS** that Petitioner's motion to withdraw the motions without prejudice be **GRANTED**, (ECF No. 73), and that the pending motions and requests for relief be **DENIED**, as withdrawn. (ECF Nos. 60, 62, 65, 70, 71, & 72).

court is well-developed and provides a sufficient basis upon which to resolve this case without need for an evidentiary hearing. *See* Rule 8, Rules Governing Section 2254 Cases.

After thorough consideration of the record, the undersigned conclusively **FINDS** that (1) there are no material factual issues in dispute and (2) Petitioner is not entitled to the relief requested. Therefore, for the reasons that follow, the undersigned respectfully **RECOMMENDS** that the District Court **GRANT** Respondent's Motion for Summary Judgment; **DENY** Petitioner's Petition for a Writ of Habeas Corpus; and **DISMISS** this case from the docket of the court.

## I.   Relevant Facts and Procedural History

### A. Indictment, Trial, and Direct Appeal

On March 4, 1997, Petitioner was indicted by a Wayne County grand jury on four counts of sexual assault in the first degree (Counts 1, 12, 13, and 14); two counts of sexual assault in the second degree (Counts 2 and 3); one count of sexual abuse in the first degree (Count 4); six counts of incest (Counts 5, 6, 7, 18, 19, and 20); and seven counts of sexual abuse by a parent (Counts 8, 9, 10, 11, 15, 16, and 17). (ECF No. 7, Ex. 1)[3]. The grand jury indicted Petitioner on the testimony of West Virginia State Trooper Michael Watts, who testified that two of Petitioner's children, J.G. (Petitioner's biological daughter) and M.W. (Petitioner's step-son),[4] claimed he sexually abused them throughout their childhoods. (ECF No. 27, Ex. 2 at 7, 14). Trooper Watts stated that he was informed of the children's complaints at a meeting of a sexual abuse task force

---

[3] Due to the age of the case, the exhibits accompanying the parties' motions and memoranda were not scanned and thus are not available on CM/ECF. However, hard copies of the exhibits are on file in the Office of the Clerk of Court, Huntington Division.

[4] The undersigned uses the victims' initials to protect their identities.

composed of law enforcement personnel, Department of Human Services representatives, social workers, Family Services representatives, and the prosecuting attorney. (*Id.* at 7). The trooper testified that he relied on information obtained by therapists and counselors in investigating the children's allegations. (*Id.* at 8-9). Trooper Watts relayed that J.G. claimed she was sexually abused by Petitioner on a daily basis from 1986, when she was three years old, until 1993, when she and M.W. were removed from the home.[5] (*Id.* at 10). According to the trooper's testimony, M.W. claimed that he was sexually abused by Petitioner every day from 1984, when he was six years old, until 1993. (*Id.* at 12). The trooper also testified that, to his knowledge, the children never informed their mother, Vernie Green, of the abuse. (*Id.* at 13). Trooper Watts stated that he had interviewed J.G., but not M.W., and that J.G. had been consistent in her allegations. (*Id.* at 14). While the trooper had not interviewed M.W., he testified that M.W.'s therapist had informed him that M.W.'s claims had been consistent as well. (*Id.*) Trooper Watts also summarized for the grand jury four specific instances of sexual abuse claimed by M.W. that formed the bases of Counts 1-11 and the more general claims by J.G. that supported Counts 12-20 of the indictment. (*Id.* at 15-32).

The grand jury was then permitted to ask questions of Trooper Watts. When asked by a member of the grand jury about any physical evidence against Petitioner, the trooper responded that J.G.'s physical examination for abuse was inconclusive "due to the prolonged sexual abuse" and that the physical examination performed after J.G. was removed from the home was inconclusive because J.G. "was abused for the previous eight or nine years, there was – it wasn't something that would be so evident as if you were raped yesterday and went to the hospital the next day." (*Id.* at 32-33). Another

---

[5] The trooper testified that the children were removed from the home as a result of physical abuse claims. (ECF No. 27, Ex. 2 at 35).

juror inquired as to the status of the marriage between Petitioner and the mother of the children. (*Id.* at 36). The trooper answered that Petitioner and the children's mother divorced after the children were removed and allegations of physical and sexual abuse surfaced. (*Id.*) Trooper Watts also stated that the children claimed their mother was both physically and sexually abused by Petitioner. (*Id.* at 35). When the trooper was asked whether Petitioner admitted to the abuse, the trooper responded that the police were unable to locate Petitioner at that point, but Trooper Watts had read letters that Petitioner had sent to J.G. instructing her, "Don't Tell. Keep quite [*sic*]. This is a big secret."[6] (*Id.* at 37). The prosecutor then interjected that he had not seen the letters, and therefore, he could not determine their relevancy and specificity. (*Id.* at 38). Trooper Watts clarified that the letters "might not show anything more than just the fact that [Petitioner] violated the court order [prohibiting contact with the children]." (*Id.*) A juror also inquired as to whether anyone outside of the home suspected that the children were being abused, and Trooper Watts replied that he was not aware of any such information. (*Id.* at 38-39).

Petitioner's first trial began on October 20, 1997, where he was represented by attorney Gregory Smith. (ECF No. 27, Ex. 3 at 1). Before the jury was seated, Counts 4, 10, 14, 17, and 20 were dismissed on motion by the State. (*Id.* at 3-4). After jury selection, Petitioner's counsel requested that the indictment be dismissed because the State had withheld discovery from Petitioner and Trooper Watts had misrepresented the evidence during the grand jury proceedings.[7] (*Id.* at 19-30). The trial court denied the

---

[6] A fair reading of the letter sent from Petitioner to J.G. shows that Trooper Watts was mistaken as to his interpretation of the letter's content. *See* ECF No. 27, Ex. 2.7. Petitioner appeared to be asking J.G. not to tell her mother that he still loved her mother. *See id.*

[7] Mr. Smith also filed a written motion on October 17, 1997, requesting the same. (ECF No. 7, Ex. 11).

motion to dismiss and trial proceeded. (*Id.* at 35). In presenting its case, the State offered the testimony of J.G., M.W., and Trooper Watts.

J.G. testified that Petitioner began touching her when she was four years old by rubbing lotion on her.[8] (*Id.* at 46). She stated that Petitioner would kiss her on her lips and breasts and that Petitioner would stick his finger in her vagina. (*Id.* at 47). According to J.G., Petitioner told her that he would go to jail if she told on him, so he asked that she not say anything about what he did to her. (*Id.* at 47-48). J.G. testified that Petitioner did things like this to her every day and that her mother was either at work or asleep when the abuse occurred. (*Id.* at 48). When asked about her step-brother, J.G. stated that Petitioner would tell M.W. to walk the dog and then Petitioner would close the curtains and lock the doors so that no one could see Petitioner abuse her. (*Id.* at 48-49). She then testified that during her spring break in 1992, while her mother and M.W. were in bed, Petitioner got on top of her, kissed her lips and chest, stuck his finger in her vagina, and forcibly tried to stick his penis in her "front and back" using lotion. (*Id.* at 49-50). J.G. recalled that the lotion "burned" and that it "really hurt" when Petitioner tried to force his penis inside of her. (*Id.* at 50). J.G. stated that Petitioner used lotion when abusing her "just about every time." (*Id.* at 52). When asked why she did not inform anyone about the abuse until she reached the fifth grade, J.G. testified that she was "very afraid" of Petitioner and feared that he would kill her. (*Id.* at 50-51). J.G. also specifically remembered that the last time that Petitioner abused her was in the summer of 1992. (*Id.* at 53).

On cross-examination, J.G. testified that she still loved Petitioner, but hated the things that he had done to her. (*Id.* at 60-61). She also stated that she believed Petitioner

---

[8] J.G. was fourteen years old and M.W. was nineteen years old at the time of Petitioner's second trial. (ECF No. 27, Ex. 6 at 52, 71).

had burned down her house and that she found out when she was ten or eleven years old that Petitioner beat her mother. (*Id.* at 61-62). J.G. testified that Petitioner beat her as well and left bruises when he beat her, but that she was able to hide the bruises from others. (*Id.* at 63). J.G. also stated that Petitioner was never able to insert his penis into her because she was too small and she would pull away. (*Id.* at 68).

M.W. testified that Petitioner began to "fondle" him at age six. (*Id.* at 71). M.W. specifically remembered that Petitioner came into his room naked on the night of his eleventh birthday. (*Id.* at 72). Petitioner then told M.W. to place Petitioner's penis in M.W.'s mouth. (*Id.*) Before M.W. complied, Petitioner placed M.W.'s penis in his mouth. (*Id.* at 73). M.W. recalled that Petitioner told him "one time" that he would shoot him and J.G. if they told anyone about the abuse. (*Id.* at 74). M.W. also stated that Petitioner would tell him or his sister to leave the house before Petitioner would abuse one of them and that he recalled a specific instance where he went to walk the dog after school and the door was locked when he came back. (*Id.*) M.W. then testified that he recalled being sexually abused by Petitioner at night in the kitchen of their home when he was fourteen years old. (*Id.* at 75). J.G. and Ms. Green were asleep while the abuse occurred in the kitchen. (*Id.*). M.W. remembered similar sexual abuse occurring when he was fifteen years old as well. (*Id.* at 76-77).

On cross-examination, M.W. testified that he did not tell anyone about being abused until J.G. first came forward after attending a school assembly on the subject of sexual abuse. (*Id.* at 80-81). He stated that when he was thirteen years old, J.G. told him she was also abused by Petitioner, but J.G. told him not to tell anyone. (*Id.* at 81). M.W. also admitted that he did not like Petitioner and that he had suspicions about Petitioner burning down their home. (*Id.* at 82). In addition, M.W. stated that he had observed

Petitioner physically abuse his mother and J.G. (*Id.*)

The State called Trooper Watts to lay foundation for the admission of two letters—one written by Petitioner to J.G. and one written by J.G. to Petitioner. (*Id.* at 84-86). Petitioner's counsel objected to their admission and the objection, after being taken under advisement, was later sustained. (*Id.* at 86; ECF No. 27, Ex. 4 at 21). On cross-examination, Trooper Watts stated that he had interviewed J.G. after months or years of therapy and counseling. (ECF No. 27, Ex. 3 at 87). However, the trooper did not interview M.W. because he was in a treatment center in Virginia. (*Id.* at 88). In regard to J.G.'s therapy and counseling, Trooper Watts stated he did not know the purpose of her treatment. (*Id.* at 90). The trooper also conceded that neither physical evidence nor eyewitness testimony was present in the case. (*Id.*) On redirect examination, Trooper Watts asserted that it was not unusual for victims of sexual abuse to attend therapy. (*Id.* at 90-91).

As part of Petitioner's case-in-chief, his nephew, Leonard Green, testified that he had never seen Petitioner put his hands on the children and that he never observed Petitioner "hover around" the children in an unusual way. (*Id.* at 96-97). Mr. Green also testified that Petitioner had been around Mr. Green's children when they were young and he never noticed anything out of the ordinary. (*Id.* at 98). However, Mr. Green admitted that he never observed Petitioner interact with the J.G. and M.W. at the house where the abuse occurred. (*Id.* at 98-99).

Petitioner testified that he was involved in a "bitter" divorce with the children's mother in 1994. (*Id.* at 100-01). He insisted that he never did anything to hurt J.G. and M.W. and that he never molested them. (*Id.* at 103, 117). He also stated that he had five other adult children who were all living successful lives and that he did not have them

testify because they all lived so far away and he did not want to ruin their lives by having them testify. (*Id.* at 104-05). On cross-examination, when asked if M.W. was lying about the allegations of abuse, Petitioner testified that "the boy and the girl have concocted something to get even with me for whatever reason." (*Id.* at 107). Petitioner suggested that they made up the sexual abuse claims because J.G. believed the Petitioner burned down the family home, killing her dog and causing her to change schools. (*Id.* at 111). Petitioner also claimed that M.W. could be holding a grudge against Petitioner because he did not like Petitioner telling him what to do when he was younger, such as requesting that M.W. perform household chores. (*Id.* at 114-16). When asked about disciplining the children, Petitioner recalled once smacking J.G., but testified that M.W. was almost always disciplined by his mother. (*Id.* at 114).

As the final defense witness, Petitioner called Dr. Patricia Jean Kelly, a pediatrician who performed a physical examination of J.G. in September 1994. (*Id.* at 118-19, 123). Dr. Kelly was contacted by J.G.'s counselor who informed the doctor that J.G. was previously evaluated, but that J.G. still had concerns about whether she was "physically normal." (*Id.* at 123). On physical examination, Dr. Kelly concluded that J.G.'s hymen "looked like a little girl's hymen." (*Id.* at 125). Dr. Kelly testified that did not observe any warts, sores, or fissures on J.G.'s external genitalia and that she did not see any warts, fissures, or ulcers in the area of her anus. (*Id.*) Dr. Kelly opined that there was no physical evidence to confirm or deny the presence of sexual abuse. (*Id.* at 126). When asked if a doctor would expect to find some physical evidence of abuse in a child who was abused on a daily basis for seven years, Dr. Kelly answered no. (*Id.*) Dr. Kelly also stated that unless a patient is seen within a matter of days, the amount of evidence of abuse "becomes less and less." (*Id.* at 130). Dr. Kelly testified that this is because the

tissue of the hymen and the vagina are mucosal, which heals quickly and may not scar. (*Id.* at 131). Although, with trauma to the hymen, sometimes bumps or disruptions remain that can be seen years later, Dr. Kelly testified. (*Id.* at 130). But, those were not present in J.G.'s case. (*Id.*) Dr. Kelly also testified that the tissue around the rectum is "the least likely place to be able to see evidence" of something that occurred a long time ago because of its "incredible capacity to heal." (*Id.* at 131).

On the morning of October 21, 1997, the jury began deliberations. At some point during deliberations, before an afternoon lunch break was taken, the jury requested the letters referenced by Trooper Watts, which were never admitted. (ECF No. 27, Ex. 4 at 54 and Ex. 5). The jury also requested a "transcript from Mr. Green." (*Id.*). In response to the jury's requests, and without objection by counsel, the trial court stated that the jury had all of the evidence and that the items requested were not available to them. (ECF No. 27, Ex. 5). The jury then took a break in deliberations until 1:15 p.m. (ECF No. 27, Ex. 4 at 55). At some point later, the jury sent out another note, this time stating that they were "split." (*Id.* at 56). The trial judge replied, "Keep working." (*Id.*) Sometime after that, the jury sent another note that stated some of the jurors were tired and wanted to go home for the night. (ECF No. 27, Ex. 5). The jury was then brought into the courtroom and the foreperson told the court that they were still deliberating, but they had reached a deadlock. (ECF No. 27, Ex. 4 at 56). The trial judge informed the jury that he could not be in the area the next day because he was a senior judge assigned to preside elsewhere. (*Id.* at 57). As such, the trial judge asked that the jurors keep working and stated that he would order dinner for them. (*Id.*) The jury returned to deliberating. (*Id.*) Later in the day, the jury sent out a final note wherein the foreperson stated that the jury was deadlocked at eight not-guilty votes and four guilty votes. (ECF No. 27, Ex.

5). The trial court then had the jury brought out and asked the foreperson whether the jury was "hopelessly deadlocked." (ECF No. 27, Ex. 4 at 58). The foreperson responded affirmatively and also stated that further deliberations would not be fruitful. (*Id.*) The trial court then declared a mistrial and set a new trial date. (*Id.*)

Petitioner's second trial began on December 9, 1997, and he was again represented by Mr. Smith.[9] (ECF No. 27, Ex. 6 at 3). The evidence adduced was largely the same as that presented in the first trial, although, a summary is appropriate here. The State called Dr. Kelly as its first witness. In addition to the facts above, Dr. Kelly testified that "[i]n studies of legally proven cases of sexual abuse, the majority of the patients have no physical evidence of abuse," and she could not rule out that sexual abuse occurred. (*Id.* at 48, 50-51).

The State's second witness was J.G. She again testified the sexual abuse began around the time that she entered kindergarten. (*Id.* at 53). She recalled a specific instance of sexual abuse in the summer of 1992. (*Id.* at 54). She stated that Petitioner sexually and physically abused her every day from the time she was in kindergarten until the fourth grade, although she later stated that the sexual abuse occurred almost every day. (*Id.* at 60-62, 63). J.G. also testified that she did not recall Petitioner working during that time period and only recalled being in daycare for a period of about two days while the abuse occurred. (*Id.* at 62-63). J.G. also remembered that she informed M.W. that she "told on dad" at school one day and that M.W. did not believe she would tell on him. (*Id.* at 66). Finally, J.G. indicated on cross-examination that she had been receiving

---

[9] Before trial began, the court ruled on several motions. Petitioner renewed his motion to dismiss the indictment, and the trial court again denied the motion. (ECF No. 27, Ex. 6 at 3, 8). Petitioner also moved for the exclusion of the letter written by Petitioner to J.G., and the court excluded the letter on relevancy grounds. (*Id.* at 10).

help from counselors for her "problems," and that the counseling was helping. (*Id.* at 68).

M.W. testified at Petitioner's second trial that his eleventh birthday was "close to the first time" he was molested. (*Id.* at 71). Again, M.W. stated that Petitioner abused him late at night on his eleventh birthday, although M.W. failed to mention that Petitioner placed M.W.'s penis in his mouth as M.W. had testified to at Petitioner's first trial. (*Id.* at 72-73). M.W. also testified again as to the abuse that occurred in the kitchen of their home, but this time he testified that his step-sister and mother were awake and watching television while the abuse occurred instead of sleeping in bed. (*Id.* at 74). M.W. stated that he did not tell anyone about the abuse because Petitioner told him he would kill him and his family if he told anyone and that he believed this threat because he had witnessed and experienced Petitioner's physical abuse in the home. (*Id.* at 76). When asked on cross-examination why he did not tell anyone about Petitioner abusing him until one year after Petitioner's arrest, M.W. testified that he believed Petitioner could still hurt him because Petitioner was released from jail and lived in a van near their home. (*Id.* at 78-79). M.W. also indicated that he had been to facilities to "get help" and that he had "mental problems, psychological problems, [and] abuse problems . . . ." (*Id.* at 80-81). Finally, M.W. testified that the abuse occurred "almost every day." (*Id.* at 84).

Trooper Watts was the State's final witness. He stated that his investigation into the case involved gathering information from agencies that were a part of the sexual abuse task force and interviewing any witnesses and victims. (*Id.* at 87). The trooper conceded on cross-examination that he was not able to find any other evidence of abuse other than the victims' allegations in his investigation. (*Id.* at 88-89).

- 11 -

As his first witness, Petitioner called his niece, Wanda Gollihe.[10] (*Id.* at 91). Ms. Gollihe testified that she had been around Petitioner since she was a little girl and that their two families were close. (*Id.* at 92). She observed Petitioner around her children and around his first five children, and she did not see Petitioner act in an abnormal manner. (*Id.* at 94-95). However, she had not seen Petitioner interact with J.G. and M.W. (*Id.* at 96).

Petitioner again called Leonard Green as a character witness. (*Id.* at 97). Mr. Green testified that he never observed "bruises or anything" on J.G. and M.W. (*Id.* at 99). He also stated that J.G. seemed to be a very happy child and that the relationship between Petitioner and the children seemed normal. (*Id.* at 101). Although, Mr. Green testified that he had "no idea" what took place in the home where the abuse occurred. (*Id.* at 103).

The final evidence presented by Petitioner was his own testimony. (*Id.* at 104). He stated that J.G. attended daycare for three to four years, beginning in kindergarten, and that her mother was responsible from picking her up from daycare each day. (*Id.* at 105-06). Petitioner again asserted that J.G. blamed him for their home burning down. (*Id.* at 107). He unequivocally denied sexually abusing J.G. and M.W. (*Id.* at 108-10). On cross-examination, the prosecutor asked whether Petitioner had anyone to "back up" his story in regard to J.G. attending daycare, and Petitioner answered no. (*Id.* at 112).

After closing arguments and jury instructions, the jury began deliberations. Approximately eighty minutes later, the jury found Petitioner guilty on all fifteen counts. (*Id.* at 180-83). Petitioner was later sentenced to consecutive sentences of fifteen to thirty-five years imprisonment on Counts 1, 12, and 13. (ECF No. 7, Ex. 3). Petitioner

---

[10] The transcript spells Ms. Gollihe's name as "Gollihue"; however, when prompted to spell her name, Ms. Gollihe stated "G-O-L-L-I-H-E." (ECF No. 27, Ex. 6 at 91).

was also sentenced to concurrent terms of imprisonment on the remainder of the counts as follows: ten to twenty-five years imprisonment on Counts 2 and 3; one to five years imprisonment on Counts 15 and 16; and five to fifteen years imprisonment on Counts 5, 6, 7, 18, and 19.[11] (*Id.*)

Petitioner appealed his conviction to the West Virginia Supreme Court of Appeals ("WVSCA") on November 18, 1998. Petitioner raised the following issues:

> 1. There was insufficient evidence to support the verdicts since the State's case rested solely on the unsupported, unbelievable, testimony of the two alleged victims, since they testified they were sexually assaulted thousands of times, when the doctor who examined one of the victims found no evidence of sexual activity.

> 2. The trial court erred in not developing the record, and making a determination regarding the State's efforts, under *Kyles v. Whitley* [514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)], to find a missing video tape interview between one of the victims and a social worker.

> 3. The prosecutor improperly commented on the petitioner's failure to produce evidence, when he cross-examined the petitioner that "there's nobody here to back up your story, is there?"

(ECF No. 27, Ex. 8). The WVSCA refused his petition for appeal on January 28, 1999. (*Id.*)

### B. State Post-Conviction Proceedings

After Petitioner's direct appeal was denied, Petitioner filed a *pro se* petition for writ of habeas corpus in Wayne County Circuit Court on February 11, 1999. (ECF No. 27, Ex. 9). Petitioner was subsequently appointed counsel, Ernest Skaggs, who filed an amended petition on September 13, 2000. (ECF No. 27, Ex. 9.1). In the amended state habeas petition, Petitioner assigned the following errors:

---

[11] Petitioner's convictions on Counts 8, 9, and 11 of the indictment for sexual abuse by a custodian were set aside by the trial court prior to sentencing. (ECF No. 7 at 6 n.2).

1. Defense counsel, Gregory V. Smith, was ineffective as counsel for the defendant, both in his investigation and preparation for trial and during the second trial which began on December 9, 1997.

Petitioner alleges in particular that defense counsel failed to effectively utilize information in school records, medical records, and counseling records, which petition believes was exculpatory.
....

2. The minimum sentence of 45 years is excessive considering the age of the defendant.

3. The evidence was insufficient to support a verdict of guilty on fifteen counts.

4. The indictment was obtained based upon false and misleading testimony presented to the grand jury by the investigating officer.

5. The State deprived the defendant of a fair and impartial trial by failing to provide timely discovery. The State further lost a video tape recording of an interview between one of the victims and a social worker. The petitioner believes the video recording contained exculpatory information which he was denied.

6. Petitioner believes he was denied a fair and impartial trial because a juror related to a deputy sheriff of Wayne County was left on the jury.

7. Any other relevant ground from *Losh v. McKenzie* [277 S.E.2d 606 (W. Va. 1981)].

(ECF No. 27, Ex. 9.1).

On September 26, 2000, an omnibus state habeas corpus evidentiary hearing was held on Petitioner's claims. (ECF No. 27, Ex. 10 at 4). At the outset of the proceedings, the court informed Petitioner that any ground not raised at the proceeding would be waived, and Petitioner responded that he understood. (*Id.*) Petitioner also answered affirmatively that his counsel had reviewed with him all of the available grounds for relief under *Losh*. (*Id.* at 5).

The only witness called to testify at the hearing was Petitioner's trial counsel, Mr. Smith. He testified that at the time of Petitioner's trials, he had approximately five years

of experience in practicing criminal law. (*Id.* at 23-24). Mr. Smith stated that he and his investigator met with Petitioner several times before trial, and Mr. Smith talked on the phone with Petitioner often prior to trial. (*Id.* at 39-40). In relation to the alleged videotape, Mr. Smith testified that he did not recall personally looking into, or having his investigator look into, the existence of the tape after the prosecutor asserted that he was unable to locate the tape. (*Id.* at 19). Mr. Smith testified that his investigator made some attempts to contact the children's mother, but that she refused to have any discussions with the investigator. (*Id.* at 26). Mr. Smith also stated that he obtained school records that he did not view as containing significant information. (*Id.* at 28).

Mr. Smith further testified that he could not recall whether he consulted a child psychologist before the trial, but he did recall that he did not have one testify at trial. (*Id.*) Mr. Smith described his trial strategy as protecting Petitioner's constitutional rights and "search[ing] for the truth." (*Id.* at 33). He stated that he was aware of sexual abuse allegations against the victims and he sought to keep "psychological mumbo-jumbo" out of the trial so that the State could not argue that the victims' actions were consistent with those who are abused. (*Id.* at 34). Mr. Smith also recalled receiving "boxes of psychological stuff on the children," but again Mr. Smith stated his strategy was to keep the psychological evidence out of the trial so that the State could not argue that the psychological evidence was consistent with those who are abused. (*Id.* at 35-36).

Mr. Smith also remembered reaching out to Petitioner's other children to testify, interviewing those children several times, and their replying that he would not like what they have to say about their father. (*Id.* at 36, 43). Mr. Smith indicated that "[t]he general feeling from most of the family was, we love our father, we would like to help our father, but then there is this we know about and, of course, we are going to tell the

truth." (*Id.* at 77). In addition, Mr. Smith testified that Petitioner had other "grown daughters" tell him that Petitioner made sexual advances toward them. (*Id.* at 36, 78). Mr. Smith added that Petitioner agreed to both the trial strategy and to the witnesses called by Mr. Smith. (*Id.* at 38, 78). Mr. Smith did concede, however, that he should have objected to the prosecutor's question on cross-examination as to whether Petitioner had any witness available to "back up" his story about J.G. attending daycare. (*Id.* at 44).

After addressing those points, Petitioner's habeas counsel then went through the list of errors provided in *Losh*, posing questions to Mr. Smith as to each potential ground for relief. (*Id.* at 57-72). During closing statements, Petitioner's habeas counsel raised additional issues that were not raised in the revised petition. First, counsel asserted that Mr. Smith acted unreasonably in failing to call Petitioner's other children to testify. (*Id.* at 82). Second, counsel asserted that Mr. Smith was ineffective in failing to introduce psychological evidence. (*Id.* at 82). Finally, Mr. Skaggs argued that trial counsel was ineffective when he failed to request a jury instruction related to uncorroborated victim testimony (a *Perry* instruction[12]). (*Id.* at 83).

Petitioner's first state habeas petition was denied in December 2000. (ECF No. 27, Ex. 5). The court found that Petitioner had not met his burden in demonstrating that his trial counsel was ineffective. (*Id.* at 4). The court concluded that Mr. Smith's trial strategy was sound in refraining from calling Petitioner's other children and in choosing not to utilize psychological evidence, including expert testimony. (*Id.* at 5-6). The court also concluded that trial counsel's error in failing to object to the prosecutor's burden-

---

[12] *See* Syl. Pt. 5, *State v. Perry*, 24 S.E. 634, 635 (W. Va. 1896) ("It is error for the court to refuse to instruct the jury that it is their duty to scrutinize with care and caution the uncorroborated and contradicted testimony of a witness.").

shifting question on cross-examination because Petitioner was not sufficiently prejudiced. (*Id.* at 6). The court also rejected Petitioner's arguments as to the *Perry* instruction, his minimum sentence, the sufficiency of the evidence, any indictment defects, the discovery violations, the composition of the jury, and his right to a speedy trial. (*Id.* at 8-20). Finally, the court found that Petitioner had waived all other grounds for relief not specifically asserted in his petition. (*Id.* at 20).[13]

On June 25, 2001, Petitioner, again represented by Mr. Skaggs, appealed the denial of his state habeas action to the WVSCA. (ECF No. 27, Ex. 12). Petitioner asserted:

> 1. The lower court erred by failing to grant the Petitioner a writ of habeas corpus based on the ineffective assistance of counsel of Gregory Smith.
>
> 2. The lower court erred by failing to grant the Petitioner a writ of habeas corpus because the *Perry* instruction was not given to the jury.
>
> 3. The lower court erred by failing to grant Petitioner a writ of habeas corpus because of the excessive sentence of a minimum of 45 years which Petitioner received.
>
> 4. The lower court erred by failing to grant petitioner a writ of habeas corpus because the evidence upon which Petitioner was convicted was insufficient to support a verdict of guilty.

(*Id.* at 2). Petitioner contended that trial counsel was ineffective in failing to speak with the children's mother before trial, declining to "properly utilize" the children's school and psychological records, failing to diligently pursue the missing videotaped interview, failing to prepare voir dire, failing to request a *Perry* instruction, failing to object to the prosecutor's improper burden-shifting question on cross-examination, and refraining from calling Petitioner's other adult children. (*Id.* at 2-4). The WVSCA refused the

---

[13] In West Virginia, a person convicted of a crime has the right to one omnibus post-conviction habeas proceeding. *Losh,* 277 S.E.2d at 609.

petition for appeal on November 28, 2001. (ECF No. 27, Ex. 13).

### C. Federal Habeas Corpus Petition

Petitioner filed his § 2254 habeas petition on November 18, 2002, raising eleven assignments of error. (ECF No. 2, Ex. 1). Respondent filed a consolidated answer, motion to dismiss, and motion for summary judgment on January 22, 2003. (ECF No. 7). Respondent insisted that several of Petitioner's claims were unexhausted and, therefore, procedurally barred from federal review. (*Id.* at 10-14). Petitioner then filed an amended petition and supporting memorandum on July 24, 2003. (ECF Nos. 26 & 27). Respondent filed an answer to the amended petition on November 18, 2003, (ECF No. 31), to which Petitioner responded on December 10, 2003, (ECF No. 32), and Respondent replied on December 23, 2003. (ECF No. 33).

In a February 22, 2006 memorandum opinion and order, Judge Chambers recognized that many of the errors raised by Petitioner in his amended habeas petition were never presented to the WVSCA. (ECF No. 42 at 5-6). Although the unexhausted claims may have been procedurally defaulted, Judge Chambers found that a "reasonable possibility exist[ed] that the state court may find that Petitioner's unexhausted claims are not procedurally barred." (*Id.* at 8). The Court also found that "Petitioner's lack of knowledge and his claims of ineffective assistance of counsel constitute[d] good cause for Petitioner's failure to exhaust his claims in state court." (*Id.* at 10). Accordingly, the Court ordered Petitioner to file a petition in state court to exhaust his claims within thirty days of the Court's order. (*Id.* at 11).

### D. Second State Habeas Petition

Petitioner filed a second state habeas petition in March 2009. (ECF No. 55 at 2). Petitioner raised five issues in that petition: (1) ineffective assistance of habeas corpus

counsel (ECF No. 51-4 at 10); (2) grand jury defects (*id.* at 12); (3) prosecutorial misconduct, including a violation of the right to a speedy trial (*id.* at 31); (4) double jeopardy (*id.* at 53); and (5) ineffective assistance of counsel on direct appeal (*id.* at 62). The state habeas court also permitted Petitioner to attach his federal petition as an addendum to his second state habeas petition.[14] *Green v. Ballard*, No. 11-1696, 2013 WL 1301324, at *13 (W. Va. Mar. 29, 2013).

On November 15, 2011, the state circuit court denied Petitioner's second state habeas petition. (*Id.* at *14). First, the court concluded that Petitioner's state habeas counsel was not ineffective. (*Id.* at *6-*7). Next, the court held that the grand jury defects and the prosecutorial misconduct raised by Petitioner were previously addressed by the first state habeas court, and thus, those claim was denied. (*Id.* at *8-*10). As for Petitioner's fourth and fifth assignments of error, the court decided that he had failed to raise any argument as to double jeopardy as well as ineffective assistance of appellate counsel in his first state habeas petition, and therefore, those claims were waived. (*Id.* at *11-*13). Finally, the state court addressed the claims raised in Petitioner's federal habeas petition. Preliminarily, the court asserted that it had already addressed claims two, three, four, five, six, nine, and ten of the federal habeas petition in its decision. (*Id.* at *13). Addressing the remainder of the federal habeas claims, the court concluded that Petitioner's ineffective assistance of counsel claim related to "pre-trial and sentencing"

---

[14] The delay between the Court's order and the filing of the second state habeas petition was explained in a February 26, 2009 memorandum opinion and order:

Petitioner attempted to exhaust state claims by filing a petition in state court. However, rather than file a new petition, he apparently filed an amended petition under his prior habeas number. For this reason, his petition has not, and likely will not, be considered by the state court. The Court recognizes that Petitioner is unrepresented, and it finds his failure to exhaust state claims occurred with good cause, given the circumstances.

(ECF No. 50 at 4).

and any new arguments as to Petitioner's sentence were waived because they had not been raised in the prior state habeas proceeding. (*Id.* at \*13-14). The court also held that Petitioner's sufficiency of the evidence argument had been addressed by the first state habeas court, and therefore, could not be revisited. (*Id.* at \*13).

On appeal, the WVSCA denied Petitioner's claims and adopted and incorporated the circuit court's findings of fact and conclusions of law. (*Id.* at \*2). The WVSCA held that the circuit court properly found that Petitioner's state habeas counsel was not ineffective, and thus, Petitioner could not assert errors that were not raised in his first state habeas proceeding. (*Id.*) Finally, to the extent that Petitioner raised any arguments related to "ordinary trial error," those claims were "not proper in a second habeas proceeding." (*Id.*)

### E. Resumption of Federal Habeas Corpus Proceedings

On July 8, 2013, Judge Chambers reopened Petitioner's federal habeas case after finding that Petitioner had exhausted the remedies available to him in state court. (ECF No. 55 at 3). This case was then referred to the undersigned, (ECF No. 56), and the parties were provided the opportunity to file additional documents and responses. (ECF No. 59). Both parties did so; therefore, this case is ready for resolution.

## II. <u>Petitioner's Claims</u>

Petitioner asserts the following eleven grounds in support of his § 2254 amended habeas petition:

1. Petitioner claims that defense counsel was so deficient in the representation of the Petitioner during his pre-trial, trial, and sentencing as to deny his right to effective assistance of counsel in violation of the Sixth Amendment. (ECF No. 27 at 12).

2. Petitioner contends that the indictment was obtained based on hearsay, false,

and misleading testimony presented to the grand jury by the West Virginia State Police in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (*Id.* at 50).

3. Petitioner avers that repeated instances of prosecutorial misconduct denied him due process, a fair trial, and a reliable sentencing determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (*Id.* at 69).

4. Petitioner asserts that the state of West Virginia violated West Virginia's discovery rules and the fundamental requirement of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), by withholding exculpatory information and failing to produce a video tape recording containing exculpatory information of an interview of one of the victims, thereby violating Petitioner's Fifth, Sixth, and Fourteenth Amendment rights. (*Id.* at 87).

5. Petitioner argues that the prosecutor committed misconduct by posing improper and inflammatory questions to Petitioner and by making improper arguments, thereby violating Petitioner's Fifth, Sixth, and Fourteenth Amendment rights. (*Id.* at 96).

6. Petitioner insists that retrial on the same charges was in violation of the double jeopardy clause of the Fifth Amendment and the right to due process of law under the Fourteenth Amendment. (*Id.* at 99).

7. Petitioner contends that the evidence record could not reasonably support a finding of guilt beyond a reasonable doubt, violating Petitioner's Fifth, Sixth, and Fourteenth Amendment rights. (*Id.* at 108).

8. Petitioner argues that the minimum sentence of forty-five years imprisonment

is excessive, considering the age of the defendant, and thereby violates Petitioner's Eighth Amendment right to a reliable penalty hearing and to be free from cruel and unusual punishment, and Fourteenth Amendment right to due process of law. (*Id.* at 118).

9. Petitioner asserts that one of the jurors seated in his trial was related to a Wayne County Deputy Sheriff, thereby violating his Sixth Amendment right to a fair and impartial jury and Fourteenth Amendment right to due process of law. (*Id.* at 120).[15]

10. Petitioner claims that he was denied his Fourteenth Amendment right to effective assistance of counsel on appeal. (*Id.* at 121).

11. Petitioner argues that he was prejudiced by each of the errors listed above. Moreover, he asserts that he has identified an accumulation of errors such that his trial proceedings were fundamentally unfair, thereby violating his Eighth Amendment right to be free from cruel and unusual punishment and Fourteenth Amendment right to due process of law. (*Id.* at 133).

III.   **Standard of Review**

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in state custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When determining the merits of a § 2254 petition, the district court applies the standard set forth in § 2254(d), which provides that the habeas petition of a person in State custody "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless

---

[15] Petitioner's amended habeas petition lists this alleged error, but Petitioner asserts in the amended petition that he has withdrawn the claim. (ECF No. 27 at 120).

the adjudication of the claim" is:

> (1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d) (1) and (2). Moreover, the factual determinations made by the state court are presumed to be correct and are only rebutted upon presentation of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e) (1). Thus, when reviewing a petition for habeas relief, the federal court uses a "highly deferential lens." *DeCastro v. Branker,* 642 F.3d 442, 449 (4th Cir. 2011).

A claim is generally considered to have been "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and independent meanings. *Williams v. Taylor,* 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). A state court decision warrants habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (quoting *Williams,* 529 U.S. at 405) (internal quotations omitted). A habeas writ may be granted under the "unreasonable application" clause if the state court "identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular case." *Id.* at 300-01 (internal marks omitted).

Accordingly, the AEDPA limits the habeas court's scope of review to the reasonableness, rather than the correctness, of the state court's decision. A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather the application must also be unreasonable." *Williams*, 529 U.S. at 365.

Here, the respondent has moved for summary judgment. (ECF No. 7). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." Charles Alan Wright, Arthur R. Miller &, Mary Kay Kane, *Federal Practice and Procedure*: *Civil* § 2725 (3d ed. 2005). Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). Consequently, motions for summary judgment impose a heavy burden on the moving party; for, it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990).

Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50). With these standards in mind, the undersigned considers each ground raised by Petitioner.

IV.    **Discussion**

   **A. Respondent's Procedural Default Argument**

Before turning to the merits of Petitioner's claims, Respondent's contention that some of Petitioner's claims have been procedurally defaulted should be addressed. *See Lambrix v. Singletary*, 520 U.S. 518, 524, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997) ("Our opinions ... certainly suggest that the procedural-bar issue should ordinarily be considered first."). Respondent asserts that Petitioner's claims of ineffective assistance of appellate counsel and double jeopardy are procedurally defaulted. (ECF No. 76 at 5, 9). Respondent points to the second state habeas court's order, which was adopted by the WVSCA, wherein the circuit court concluded that Petitioner had failed to raise the issues of ineffective assistance of appellate counsel and double jeopardy during his first state habeas proceeding. *Green*, 2013 WL 1301324, at *11-*13.

"Federal courts may not hear a section 2254 claim if a state court disposed of the claim on adequate and independent state-law grounds, unless the petitioner can show

cause and prejudice for, or a fundamental miscarriage of justice resulting from, failure to comply with the applicable rule." *Bostick v. Stevenson*, 589 F.3d 160, 164 (4th Cir. 2009). "A rule is adequate if it is regularly or consistently applied by the state court ... and is independent if it does not depend on a federal constitutional ruling." *Hedrick v. True*, 443 F.3d 342, 359 (4th Cir. 2006) (internal citations and markings omitted) (ellipsis in original). The Fourth Circuit has held that a state procedural rule nearly identical to West Virginia Code § 53-4A-1(c), which creates a rebuttable presumption that a state habeas petitioner knowingly and intelligently waives any claim that could have been presented during a state habeas proceeding but that was not presented at that time, constitutes an adequate and independent state law ground for a decision. *Mu'Min v. Pruett*, 125 F.3d 192, 197 (4th Cir. 1997).

Petitioner has not directly addressed Respondent's position as to procedural default, and he has neither asserted cause and prejudice nor a miscarriage of justice. Instead, Petitioner has contended that his state habeas counsel was ineffective. (ECF No. 27 at 129-31). While the WVSCA could have concluded that state habeas counsel was ineffective and addressed Petitioner's claims on the merits, *Losh*, 277 S.E.2d at 611, the court held the opposite and thereby adopted the circuit court's conclusion that Petitioner waived those claims not raised at the first habeas proceeding. *Green*, 2013 WL 1301324, at *2.

The Fourth Circuit has explained that "[a] procedural default is excusable under the cause and prejudice standard when the petitioner demonstrates (1) that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule, and (2) that errors at his trial ... worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional

dimensions." *Wolfe v. Johnson*, 565 F.3d 140, 158 n.27 (4th Cir. 2009) (internal markings and citations omitted) (ellipsis and emphasis in original). Because "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause," Petitioner has not alleged any factor not attributable to the defense that satisfies the cause prong. *Maples v. Thomas*, ____ U.S. ____, 132 S. Ct. 912, 922, 181 L. Ed. 2d 807 (2012) (markings omitted). Nevertheless, in certain, limited situations, state habeas counsel's ineffectiveness may excuse a procedural default and permit a court to reach the merits of an ineffective assistance of *trial* counsel claim. *Trevino v. Thaler*, ____ U.S. ____, 133 S. Ct. 1911, 1918, 185 L. Ed. 2d 1044 (2013) (citing *Martinez v. Ryan*, ____ U.S. ____, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012)). This rule does not, however, apply to claims of ineffective assistance of *appellate* counsel. *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013). Similarly, a claim of double jeopardy is not excepted from a finding of procedural default based on the purported ineffectiveness of state habeas counsel in failing to raise the claim. Accordingly, Petitioner cannot satisfy the cause and prejudice requirement to excuse the procedural default of his claims.

Likewise, Petitioner has not established, or even argued, that a fundamental miscarriage of justice will occur if these claims are not addressed on their merits. The undersigned will not construct Petitioner's arguments opposing procedural default for him.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner's ineffective assistance of appellate counsel and double jeopardy claims were procedurally defaulted. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground six and part of ground ten of the petition.

**B. Ineffective Assistance of Trial Counsel**

In his first assignment of error, Petitioner alleges that "defense counsel was so deficient in the representation of the Petitioner during his pre-trial, trial and sentencing as to deny his right to effective assistance of counsel in violation of the Sixth Amendment." (ECF No. 27 at 12). Petitioner's ineffective assistance of trial counsel claim has four components. First, Petitioner alleges trial counsel was ineffective in failing to prepare a defense and failing to conduct an adequate pre-trial investigation of the facts and relevant law. (*Id.* at 13) Second, Petitioner alleges trial counsel was ineffective for failing to call a medical expert. (*Id.* at 30). Third, Petitioner alleges trial counsel was ineffective for failing to call certain fact and character witnesses. (*Id.* at 33). Finally, Petitioner alleges trial counsel was ineffective for failing to raise proper objections.[16] (*Id.* at 44).

The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the right to the effective assistance of counsel." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate ... defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor,* 535 U.S. 162, 166, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

---

[16] Petitioner also asserts a fifth ground with a list of alleged errors committed by trial counsel and no explanation of any of the claims. (ECF No. 27 at 47). These additional contentions do not meet the pleading standards required of federal habeas petitions. *Ault v. Waid*, 654 F. Supp. 2d 465, 475 (N.D.W. Va. 2009). In any event, the underlying issues of a majority of the claims are addressed below.

*Strickland*, 466 U.S. at 687-88, 694. When reviewing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690. Moreover, counsel's performance should be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and a court should not allow hindsight to alter its review. *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003). In addition, trial strategy devised after investigating the law and facts is "virtually unchallengeable." *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995).

In a § 2254 proceeding, the standard of review differs somewhat from the standard used in the direct review of a *Strickland*-based challenge. *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785, 178 L. Ed. 2d 624 (2011). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem review is doubly so." *Id.* at 788 (internal citations and quotations omitted). "'Surmounting *Strickland's* high bar is never an easy task[;]' ... Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* (quoting *Padilla v. Kentucky,* 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010)). The question, then, is not "whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* at 788. In some circumstances, however, when a petitioner has raised a claim of ineffective assistance of counsel in a state habeas proceeding that is not adjudicated on the merits, AEDPA deference will not apply, and the claim is reviewed *de novo. See Winston v. Pearson*, 683 F.3d 489, 496 (4th Cir. 2012). To accommodate such a situation in this case—particularly given its protracted and circuitous course—to the

extent the state court record is not entirely clear on whether specific claims were fully adjudicated on the merits, the undersigned has reviewed them *de novo* under *Strickland*. Nevertheless, even applying this more lenient standard of review, Petitioner is not entitled to habeas relief.

### 1. Failure to prepare a defense and conduct a thorough pre-trial investigation

Petitioner first argues that trial counsel was ineffective for failing to prepare a defense and failing to conduct an adequate pre-trial investigation. (ECF No. 27 at 13). Petitioner asserts an abundance of sub-arguments in this single claim. Specifically, Petitioner avers that trial counsel was ineffective when he failed to use the psychological evidence available to him, failed to consult with a medical expert and read literature related to child sexual abuse allegations, and failed to offer exculpatory evidence and other evidence tending to show that the children fabricated their stories.[17] (*Id.* at 13-29). According to Petitioner, his case, like many sexual abuse cases, was a credibility contest. Therefore, counsel needed to fully investigate and develop the psychological aspects of the case, the significance of the records, and the information known to the children's mother. Since counsel's defense was based on theory that the children concocted their claims of abuse, he should have collected evidence to poke holes in their stories, yet he failed to do so.

To begin, Petitioner claims that trial counsel was constitutionally ineffective for "failing to produce evidence other than [Petitioner] and pursue exculpatory evidence." (ECF No. 27 at 16). Petitioner essentially argues that trial counsel should have presented

---

[17] Petitioner's claim related to consultation with a medical expert is addressed in the next section. While there may be a difference between pretrial preparation in consulting with an expert and calling an expert at trial, Petitioner's arguments are nearly identical, and the undersigned rejects those arguments for the same reasons.

evidence to undermine the victims' credibility and that the failure to produce evidence from a "disinterested source" was fatal to his defense. (ECF No. 27 at 18). However, Petitioner has not established what disinterested source his counsel could have presented. *See Bassette v. Thompson*, 915 F.2d 932, 940 (4th Cir. 1990) ("The great failing of the appellant on his claim that other evidence should have been presented during the sentencing phase of his trial is the absence of a proffer of testimony from a witness or witnesses he claims his attorney should have called.").

To the extent that Petitioner argues counsel should have presented evidence of the victims' behavioral and psychological problems, the first state habeas court rejected that claim after Mr. Smith testified that his strategy was to avoid psychological evidence and to avoid having the prosecutor argue that the psychological evidence was consistent with the sexual abuse allegations. Mr. Smith testified at the state habeas evidentiary hearing that he was aware of the psychological evidence related to the victims and he chose to avoid producing that evidence at trial as a matter of strategy. The records from Mr. Smith's investigator also show that he interviewed various people, including therapists and psychologists, and reported back to Mr. Smith. (ECF No. 27, Ex. 10 at 49). The first state habeas court held that counsel's decision to withhold psychological testimony and not use expert testimony in the area was a strategic decision, and that counsel's strategy was "prudent under the circumstances and in view of the evidence." (ECF No. 27, Ex. 5 at 7). The undersigned cannot conclude that the state court's holding was contrary to, nor an unreasonable application of, any federal law.[18] *See Moore v. Hardee*, 723 F.3d 488, 497 (4th Cir. 2013) ("Even if, 'in some cases, counsel would be deemed ineffective for failing to consult or rely on experts,' 'state courts ... have wide

---

[18] It is not clear that the numerous articles relied on by Petitioner in support of this claim were ever presented to the first state habeas court.

latitude' to determine when an expert is necessary.'") (quoting *Richter*, 131 S. Ct. at 789).

Petitioner also argues that trial counsel was ineffective for "fail[ing] to conduct an adequate pre-trial investigation and pursue exculpatory evidence." (ECF No. 27 at 18). Again, much of this argument relates to trial strategy regarding psychological evidence, which the undersigned finds was reasonable. Petitioner also contends that trial counsel was ineffective for failing to conduct adequate discovery. However, the record reflects that Mr. Smith repeatedly made discovery requests of the prosecutor, filed motions for discovery before trial, and performed independent discovery through the use of subpoenas and a private investigator. Thus, Petitioner's claim lacks merit. Moreover, Petitioner's averment that counsel was ineffective for failing to realize that the prosecution was "withholding critical records" is entirely speculative and merely a reflection of records that Petitioner wishes existed at the time of his trial. Petitioner also generally complains about the investigation performed by the State; however, such a fault is not attributable to his counsel. Petitioner also asserts that counsel was ineffective in failing to request the victims' medical records for the period prior to 1993, but he only speculates as to what information those records could have contained.

Overall, Petitioner has not demonstrated Mr. Smith was ineffective in conducting his pre-trial investigation. Furthermore, the record demonstrates that Mr. Smith prepared a defense for Petitioner after reviewing the discovery that he was able to obtain. Finally, to the extent that the state court examined the activities of trial counsel in preparing and presenting Petitioner's defense, the court found that counsel's services fell within the range of acceptable professional standards. This conclusion by the state court was not unreasonable. Accordingly, this portion of Petitioner's ineffective

assistance of counsel claim fails.

### 2. Failure to call a medical expert

Petitioner also argues that counsel was ineffective in failing to call a medical expert to testify at his trial. (ECF No. 27 at 30). Petitioner believes an expert should have been called to testify as to the "mismatch" between the victims' testimony and the physical evidence. (*Id.* at 31). In support of his position, Petitioner relies heavily on *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001), and *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001).[19]

In *Pavel*, the defendant was accused of sexually abusing his two minor sons. 261 F.3d at 211. Prior to trial, the defendant's attorney did not prepare a defense; instead, he believed that the trial court would grant a motion to dismiss at the close of the prosecution's case-in-chief. *Id.* at 211-12. At trial, the prosecutor offered the testimony of a medical expert who stated that one of the victims had "discoloration of the skin, redness around the anal area," and that this redness could be consistent with the victim's account of sexual abuse. *Id.* at 215. Defense counsel did not call a medical expert to testify as to the medical evidence adduced by the prosecution. *Id.* at 223. Instead of receiving a dismissal of the charges, defendant was convicted. On appeal from the district court's denial of the defendant's federal habeas petition, the Second Circuit held that trial counsel rendered ineffective assistance of counsel when he failed to consult with a medical expert prior to trial concerning the prosecution's physical evidence. *Id.* at 223. In its reasoning, the court stated: "Because of the importance of physical evidence

---

[19] The record does not demonstrate that this specific claim was raised on direct appeal to the WVSCA or in Petitioner's first state habeas proceedings. Respondent did not raise the issue of procedural default as to this claim in his most recent filing, (ECF No. 76), and it is unclear whether the second state habeas court held that this particular claim was procedurally defaulted. In any event, the undersigned will address the merits of the claim.

in credibility contest sex abuse cases, in such cases physical evidence should be a focal point of defense counsel's pre-trial investigation and analysis of the matter. And because of the vagaries of abuse indicia, such pre-trial investigation and analysis will generally require some consultation with an expert." *Id.* at 224. The court concluded that defense counsel should have consulted with a medical expert because he did not possess the education or experience to assess the physical evidence and there was "an obvious, commonsense mismatch" between the medical evidence and the victims' allegations. *Id.*

*Lindstadt* involved similar allegations of sexual abuse. In that case, the defendant was convicted of sexually abusing his daughter. 239 F.3d at 193. The only physical evidence of abuse introduced was the testimony of a pediatrician who testified that when examining the victim, he observed bumps and clefts on her hymen and scarring in her vaginal area using a dye test, both of which he concluded were consistent with sexual abuse. *Id.* at 195-96. The doctor also testified that he arrived at his conclusion that sexual abuse had occurred based on a "Boston study," and a review conducted by another physician. *Id.* Defense counsel failed to obtain a copy of the "Boston study," failed to research other studies that would have contradicted the pediatrician's testimony, and failed to request the physician review relied on by the pediatrician. *Id.* at 201-02. As such, the Second Circuit concluded that "defense counsel's failure to consult an expert, failure to conduct any relevant research, and failure even to request copies of the underlying studies relied on by [the doctor] contributed significantly to his ineffectiveness." *Id.*

Petitioner's reliance on the decisions in *Pavel* and *Lindstadt* is misplaced, however, because in Petitioner's case, the medical expert, Dr. Kelly, provided equivocal opinions at trial. Rather than confirming the victims' stories, Dr. Kelly stated that she

could not conclude whether sexual abuse had occurred based on her physical examination of J.G. (ECF No. 27, Ex. 6 at 51). After the first trial, Mr. Smith was aware that the medical testimony would essentially be neutral. *See* ECF No. 27, Ex. 3 at 126. Thus, he was not forced to combat interpretations of medical evidence at trial, which clearly distinguishes Petitioner's case from the Second Circuit cases that he cites. Because Dr. Kelly's testimony did not establish the prosecution's case, defense counsel's strategy in refraining from calling a medical expert was eminently reasonable. *See Jackson v. Conway*, 763 F.3d 115 (2d Cir. 2014) (distinguishing *Pavel* and holding trial counsel not ineffective where defense counsel and prosecutor would be "on the same footing at trial" and defense counsel could have made strategic decision not to call medical expert for fear of concessions that may be made on cross-examination of expert); *see also Moore*, 723 F.3d at 497 (recognizing "wide latitude" give to state court's on habeas review in determining whether expert testimony is necessary).

Petitioner must also demonstrate what testimony from a medical expert would have aided his defense. *See Bassette*, 915 F.2d at 940. While he claims that a medical expert would have testified to the "commonsense mismatch" between the medical evidence and J.G.'s allegation that Petitioner abused her thousands of times, he fails to show that a medical mismatch actually existed. (ECF No. 27 at 31). Moreover, Petitioner's counsel raised this line of defense during J.G.'s cross-examination and certainly argued a mismatch in the evidence during his closing argument. (ECF No. 27, Ex. 6 at 171-73). Assuming for argument's sake that defense counsel was ineffective when he failed to call a medical expert, Petitioner is hard-pressed to show prejudice. The testimony of another physician would undoubtedly have been cumulative of the testimony provided by Dr. Kelly and the argument offered by counsel, and was unlikely

to change the outcome of the trial. Ultimately, the jury convicted Petitioner even after hearing that there was no physical evidence of abuse to support the prosecution's case.

### 3. Failure to call important fact and character witnesses

Petitioner next asserts that trial counsel was ineffective when he failed to call certain witnesses at trial. (ECF No. 27 at 33). Petitioner insists that defense counsel should have called Dr. Deborah Gillespie, Petitioner's other children, J.G.'s various foster parents, and Ms. Green. (*Id.* at 33-43).[20] Petitioner argues that "'[t]hough there may be instances when the decision not to contact a potential defense witness is justified, [...] an attorney who fails even to interview a readily available witness whose noncumulative testimony may potentially aid the defense should not be allowed automatically to defend his omission simply by raising the shield of trial strategy and tactics.'" (*Id.* at 36) (quoting *Crisp v. Duckworth*, 743 F.2d 580, 584 (7th Cir. 1984)).

In November 1993, Dr. Gillespie performed a physical examination of J.G. at the request of Child Protective Services.[21] (ECF No. 27, Ex. 14). At that visit, J.G. reported to Dr. Gillespie that "her father started fondling her when she was about five years old. She states it occurred most often after showers or at bedtime. He would touch her on both her front and back side. She also states that he touched his 'private parts' to hers. She says that sometimes her mother would be home when this happened . . . . The patient denies any actual penetration or any abuse by any other members of the family." (*Id.*) In her assessment, Dr. Gillespie stated J.G. had a "questionable history of sexual abuse."

---

[20] The record does not demonstrate that the specific claims related to Dr. Gillespie, J.G.'s foster parents, and Ms. Green were raised on direct appeal to the WVSCA or in Petitioner's first state habeas proceedings. Respondent did not raise the issue of procedural default as to these claims in his most recent filing, (ECF No. 76), and it is unclear whether the second state habeas court held that these particular claims were procedurally defaulted. In any event, the undersigned will address the merits of the claims.

[21] J.G. was ten years old at the time of the examination. (ECF No. 27, Ex. 14).

(*Id.*) Dr. Gillespie also did not report anything abnormal upon physical examination. (*Id.*)

Petitioner believes Dr. Gillespie should have been called to testify that no physical evidence was found and that J.G.'s story was inconsistent. (ECF No. 27 at 33-34). More specifically, Petitioner points out that J.G. testified at trial that most of the assaults occurred after school, but told Dr. Gillespie that the abuse occurred after showers or at bedtime. (*Id.* at 33-34). Petitioner also argues that information reported by J.G. to Dr. Gillespie conflicted with information recorded in various court-appointed special advocate reports, (ECF No. 27, Ex. 2.4). In addition, Petitioner avers that Dr. Gillespie's testimony would have been compelling because she physically examined J.G. in close temporal proximity to when the abuse giving rise to Counts 14, 17, and 20, occurred.[22] (ECF No. 27 at 34).

Petitioner's argument as to Dr. Gillespie is unconvincing. First, the jury was made aware of the lack of physical evidence through Dr. Kelly's testimony. Moreover, Dr. Kelly testified that signs of abuse may dissipate in as little as seventy-two hours, so Dr. Gillespie examining J.G. within one month of alleged abuse is of little significance. (ECF No. 27, Ex. 6 at 49). Second, Dr. Gillespie would have been permitted to testify to the abuse allegations made by J.G. and that some of the information that J.G. provided was consistent with her trial testimony, such as Petitioner rubbing his penis on her "private parts" and the abuse beginning at a young age. While the inconsistencies regarding when the abuse took place and who was present in the home at the time of the abuse *may* have aided Petitioner's case, counsel was not unreasonable in refraining from calling a witness who could echo J.G.'s abuse allegations and lend some consistency over

---

[22] Those counts were later dismissed. (ECF No. 27, Ex. 3 at 3-4).

time to her claims. Furthermore, considering that this witness is yet another individual to whom J.G. told her story of abuse, the testimony, overall, is not so favorable to Petitioner as to create a reasonable probability that calling Dr. Gillespie as a defense witness would have resulted in a more favorable outcome at trial.

Next, Petitioner attacks counsel's choice of character witnesses. Petitioner believes his other children should have been called to testify. (ECF No. 27 at 37). Petitioner points out that his other children have completed affidavits asserting that they would have testified favorably for him at trial. *See* ECF No. 27, Ex. 22. However, Petitioner has not demonstrated that those affidavits were in the record when the first state habeas court decided this claim. In fact, they could not have been—Petitioner's first state habeas case was decided on December 8, 2000, and the affidavits were created in July 2003. When analyzing a state court's rejection of a state's prisoner's claim, the federal habeas court is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, ____ U.S. ____, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011).

The only evidence before the first state habeas court on this claim was Mr. Smith's testimony that Petitioner's other children would not be helpful to the defense. Another of Petitioner's daughters informed Mr. Smith that he made sexual advances toward her. Given this evidence, the circuit court concluded that counsel's "decision not to seek admission of Petitioner's other children was likely a good trial strategy." (ECF No. 27, Ex. 5 at 5). In view of Mr. Smith's unchallenged testimony, the state court's decision on the issue was not unreasonable.

Moreover, even considering the affidavits and assuming that Petitioner's other children were willing to positively testify on his behalf, Petitioner has failed to

demonstrate that their testimony would have resulted in a favorable outcome at trial. Petitioner's other children lived out of state, and none of them resided in the home where the sexual assaults took place. Even if one, or more, of Petitioner's children testified that he never molested them during their childhood, this testimony would not rule out the possibility that Petitioner molested J.G and M.W.; particularly, since they had a different mother, different siblings, and different living circumstances.

Petitioner also believes that trial counsel should have called J.G.'s foster parents to testify. (ECF No. 27 at 39). Petitioner asserts that J.G.'s foster parents could have testified to J.G.'s behavioral problems. (*Id.*) Additionally, Petitioner contends that the foster parents could have testified that J.G. had a "willingness to make false allegations." (*Id.*) Petitioner further argues that counsel should have called one of the J.G.'s foster parents to contradict J.G.'s trial testimony as to who was home when the abuse occurred because J.G. allegedly told the foster parent that her mother was present in the next room during the abuse. (*Id.*)

Much of this evidence falls into the category of the psychological evidence that trial counsel attempted to minimize. The prosecutor could have argued that J.G.'s behavioral problems were consistent with abuse. As stated above, trial counsel's strategy in refraining from opening the door to further psychological evidence was a reasonable one. In addition, the benefit of calling the foster parent to testify to the inconsistency as to who was present when the abuse occurred would have likely been outweighed by further testimony by the witness reiterating J.G.'s allegations of sexual abuse. Even if the jury did find J.G.'s statements to be inconsistent, it was certainly reasonable for counsel to scrupulously avoid bringing attention to any consistencies in her allegations through other witnesses.

Finally, Petitioner argues that counsel should have called Ms. Green to testify. (ECF No. 27 at 40). He insists that Ms. Green could have shed light on why the children fabricated the abuse allegations against him. (*Id.*) Petitioner contends that Ms. Green could have testified about M.W.'s prior allegations of sexual abuse against his biological father. (*Id.*; ECF No. 27, Ex. 15). Petitioner also avers that Ms. Green would have testified that she arrived home from work each day at 3:30 p.m., which purportedly contradicts the victims' testimony that Petitioner abused them after school. (ECF No. 27 at 41).

Petitioner has failed to show that counsel acted unreasonably in refraining from calling Ms. Green. The record indicates that counsel attempted to reach Ms. Green, but she would not speak with him. Thus, counsel had no idea what Ms. Green would say at trial. A cardinal rule in litigation is that an attorney should never ask a question to which he or she does not know the answer. Petitioner concedes that "Ms. Green was hostile towards Petitioner, and that Petitioner had also indicated this fact to Mr. Smith." (*Id.* at 40). Armed with this knowledge, Mr. Smith undoubtedly exercised great wisdom when he decided not to call as a witness Petitioner's ex-wife, who was the mother of the children Petitioner was accused of sexually and physically abusing, who was not inclined to help Petitioner, and whose knowledge was unknown. *See Boyle v. McKune*, 544 F.3d 1132, 1138 (10th Cir. 2008). ("[T]he speculative witness is often a two-edged sword.").

### 4. Failure to raise proper objections

Petitioner next contends that counsel was ineffective for failing to raise three objections at trial. (ECF No. 27 at 44). First, Petitioner states that trial counsel was ineffective for failing to object to "the trial court's refusal to provide the jury with requested trial evidence during deliberations" during his first trial. (*Id.*) Next, Petitioner

insists that counsel was ineffective for failing to object to the first court's declaration of a mistrial. (*Id.*) Finally, Petitioner argues that counsel was ineffective for failing to object to comments made by the prosecutor at trial. (*Id.*) Specifically, Petitioner points to the prosecutor's questioning related to whether Petitioner had anyone available to "back up" his story that J.G. was in daycare during the time that she alleged the abuse occurred. (*Id.*) Petitioner also insists that the prosecutor made "prejudicial comments" when asking the jury during closing argument why the children would concoct the abuse allegations and that the prosecutor improperly summarized the burden of proof when he stated that the jury could convict Petitioner based on the victims' uncorroborated testimony if the jury did not find their testimony "inherently incredible." (*Id.* at 44-45).

Petitioner's first contention is without merit. The letters requested by the jury were never admitted into evidence, and thus, they could not properly be reviewed by the jury during deliberations. Furthermore, Petitioner has failed to establish that it was routine trial court procedure in West Virginia to provide a transcript of in-court witness testimony for use in deliberations, or that a transcript was even available. Most often, juries are required to use their collective memory of the testimony while deliberating. Therefore, any objection by trial counsel to the trial judge's denial of the jury's request would have been futile. An attorney is not ineffective for abstaining from impractical objections. *Oken v. Corcoran*, 220 F.3d 259, 269-70 (4th Cir. 2000).

Petitioner's second contention similarly fails for the reasons stated in the footnote in the double jeopardy discussion below. In short, counsel's objection to the declaration of a mistrial would have been fruitless because the foreperson informed the court, after twice being sent back for further deliberations, that the jury was deadlocked. *See Blueford v. Arkansas*, ____ U.S. ____, 132 S. Ct. 2044, 2052, 182 L. Ed. 2d 937

(2012) (recognizing that deadlocked jury is "classic basis" for establishing manifest necessity to declare mistrial). In addition, the trial court was not required "to consider any particular means of breaking the impasse" before declaring a mistrial because of a deadlocked jury. *Id.* Counsel was not ineffective for failing to object. *Oken*, 220 F.3d at 269-70.

Finally, Petitioner argues that counsel was ineffective for not objecting to certain questions during cross-examination of Petitioner and certain portions of the prosecutor's closing argument. The first state habeas court denied this claim because Petitioner failed to demonstrate prejudice. (ECF No. 27, Ex. 5 at 6). This issue is discussed in detail below, but merits some mention here. Assuming that Petitioner has established his counsel was ineffective in failing to raise these objections at trial, he has not demonstrated that he suffered prejudice justifying relief. For the reasons stated in the "Prosecutorial Misconduct – Improper Questioning and Argument" section, Petitioner has failed to show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687-88, 694.

### 5. Ineffective Assistance of Trial Counsel Conclusion

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner has failed to establish that the state court's denial of his ineffective assistance of trial counsel claim was an objectively unreasonable application of, or contrary to, clearly established federal law. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground one of the petition.

### C. Grand Jury Defects

Petitioner insists that his indictment was obtained based on hearsay as well as perjured and misleading testimony presented to the grand jury by Trooper Watts. (ECF No. 27 at 50). Petitioner asserts that his convictions must be reversed because these defects in the grand jury proceedings render the resulting indictment unconstitutional. (*Id.*) Respondent retorts that there was significant evidence to support the crimes listed in the indictment absent any misstatement or misinterpretation by Trooper Watts. (ECF No. 76 at 7).

Petitioner's first contention related to hearsay testimony is unconvincing. In fact, the Supreme Court has stated that an indictment based on hearsay alone passes constitutional muster under the Fifth Amendment. *Costello v. United States*, 350 U.S. 359, 363, 76 S. Ct. 406, 100 L. Ed. 397 (1956). Accordingly, Petitioner is not entitled to relief on this ground.

Petitioner's second contention related to Trooper Watts' allegedly false and misleading testimony is similarly dubious. The first state habeas court examined the merits of this claim and recognized that, under West Virginia law, "'except for willful, intentional fraud the law of this State does not permit the court to go behind the indictment to inquire into the evidence considered by the grand jury, either to determine its legality or its sufficiency.'"[23] (ECF No. 27, Ex. 5 at 15). The circuit court held that "despite the investigators [*sic*] allegedly erroneous testimony . . . there was significant evidence presented to the grand jury to support all elements of the alleged criminal offenses." (*Id.* at 16).

---

[23] Quoting Syl. Pt. 2, *State ex rel. Pinson v. Maynard*, 383 S.E. 2d 844, 845 (W.Va. 1989).

Even recognizing that Trooper Watts' grand jury testimony was embellished or potentially misleading at certain points, for example, his testimony concerning the letter written by Petitioner to J.G. and his testimony related to J.G.'s physical examination, Petitioner has failed to cite a single case from the Supreme Court (or any other federal court case applying Supreme Court precedent) to establish that the state court's holding on the facts of this case was either contrary to, or an unreasonable application of, federal law. Instead, Petitioner primarily cites cases where dismissal of an indictment was challenged on direct appeal to a federal court of appeals or where a defendant challenged his conviction on direct appeal because the prosecutor knowingly presented false testimony to the grand jury or at trial. *See, e.g.*, ECF No. 27 at 62-63 (citing *Napue*, 360 U.S. at 269-70; *United States v. Samango*, 607 F.2d 877, 884 (9th Cir. 1979); *United States v. Basurto*, 497 F.2d 781, 785-86 (9th Cir. 1974)). Those cases do not provide much guidance here as the state habeas court's decision is entitled to deference. In addition, Petitioner has not shown that there was prosecutorial misconduct in the grand jury proceedings or that the prosecutor knowingly presented false testimony to the grand jury. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 260, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988)(holding that misleading summary of evidence presented to grand jury through witness without prosecutorial misconduct did not provide ground for dismissing indictment); *United States ex rel. Clauser v. McCevers*, 731 F.2d 423, 431 (7th Cir. 1984) (holding that intentional or negligent misrepresentations by state law enforcement officer before grand jury would not be attributable to prosecutor where officer's misconduct was beyond prosecutor's knowledge and control).

Finally, the state habeas court's review came after Petitioner was convicted by a petit jury. The Supreme Court has stated that a "petit jury's verdict of guilty beyond a

reasonable doubt demonstrates a *fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted," and that "the societal costs of retrial after a jury verdict of guilty are far too substantial to justify setting aside the verdict simply because of an error in the earlier grand jury proceedings." *United States v. Mechanik*, 475 U.S. 66, 67, 73, 106 S. Ct. 938, 89 L. Ed. 2d 50 (1986); *see also United States v. McDonald*, 61 F.3d 248, 252 (4th Cir. 1995) ("Relief from an erroneous indictment after a case has been decided by a petit jury is rarely granted."), *overruled on other grounds by United States v. Wilson*, 205 F.3d 720, 724 n.1 (4th Cir. 2000). Petitioner's case is not one of those rare cases where the alleged grand jury defects would entitle him to relief.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner has failed to establish that the state court's denial of his claim related to the grand jury proceedings was an objectively unreasonable application of, or contrary to, clearly established federal law. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground two of the petition.

### D. Prosecutorial Misconduct – Speedy Trial

In his next claim, Petitioner avers that "repeated instances of prosecutorial misconduct denied [him] due process, a fair trial, and a reliable sentencing determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendment." (ECF No. 27 at 69). There are three components to this assignment of error: (1) Petitioner's right to a speedy trial was violated (*id.* at 69); (2) the prosecutor acted improperly before the grand jury and at trial (*id.* at 79); and (3) Petitioner was

prejudiced by excessive pre-indictment delay (ECF No. 27 at 85).[24] Petitioner focuses most of his attention on the speedy trial issue.

The substance of the second component is addressed throughout this PF&R, and the undersigned need not reiterate those discussions here. Suffice to say, Petitioner's claim related to prosecutorial misconduct before the grand jury and at trial is without merit, and he has failed to convince the undersigned that the decision of the state court on the issue is contrary to, or an unreasonable application of, clearly established federal law. As to the issue of pre-indictment delay, the second state habeas court held that Petitioner had waived his claim related to pre-indictment delay by failing to raise it on direct appeal or during his first state habeas proceeding. *Green*, 2013 WL 1301324, at *10. While Respondent overlooked that Petitioner has procedurally defaulted this claim in his most recent filing (ECF No. 76 at 7-8), that does not preclude the undersigned from concluding that the claim is procedurally defaulted. *Hill v. Braxton*, 277 F.3d 701, 705 (4th Cir. 2002). Based on the precedent cited in section IV.A above, the undersigned recommends that the District Court find that Petitioner's pre-indictment delay claim has been procedurally defaulted. With that, the undersigned turns to Petitioner's speedy trial claim.

On March 4, 1997, Petitioner was indicted. (ECF No. 7, Ex. 1). On March 19, Petitioner was arrested. (ECF No. 27, Ex. 23). On April 18, 1997, Petitioner's trial counsel moved for a continuance of the trial date because the prosecutor had yet to provide any discovery. (ECF No. 7, Ex. 11 at 2). On May 6, the trial court granted the continuance and trial was set for September 13. (*Id.*) On July 10, the prosecutor provided Petitioner with a copy of the investigating officer's report. (*Id.* at 3). Between

---

[24] The electronic version of Petitioner's brief is missing page 85.

July and August, additional discovery was provided by the State to defense counsel. (ECF No. 27, Ex. 3 at 23). On August 21, defense counsel again moved for a continuance of the trial date because discovery was not complete. (ECF No. 7, Ex. 11 at 4). Petitioner's first trial began on October 20, (ECF No. 27, Ex. 3 at 1), and his second trial began on December 9 (ECF No. 27, Ex. 6 at 1). Before Petitioner's first trial, defense counsel moved for dismissal of the indictment based, in part, on the State's delay in producing discovery. (ECF No. 27, Ex. 3 at 28-30).

At the state omnibus evidentiary hearing, Mr. Smith testified that he never raised the issue of Petitioner's speedy trial right because he and Petitioner "were not in a hurry" and they "needed time to investigate and prepare." (ECF No. 27, Ex. 10 at 59). The first state habeas court denied Petitioner's speedy trial claim and held that Petitioner had failed to establish any discovery violations existed causing delay and that his argument was without merit. (ECF No. 27, Ex. 5 at 19-20).

The Sixth Amendment to the United States Constitution guarantees a criminal defendant's right to a speedy trial. In *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the Supreme Court held that speedy trial claims should be analyzed by balancing four factors: "(1) [l]ength of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant." The length of the delay is measured from the return of an indictment to the start of trial, as the right to a speedy trial "does not protect a defendant from a pre-indictment delay." *United States v. Hall*, 551 F.3d 257, 271 (4th Cir. 2009). A length of delay that is "presumptively prejudicial" is a prerequisite to addressing the remaining factors; however, the Supreme Court has not set forth a rigid rule as to an amount of delay that triggers further analysis. *Barker*, 407 U.S. at 530. Although, a delay approaching one

year generally satisfies the threshold and triggers an in-depth speedy trial analysis. *Doggett v. United States*, 505 U.S. 647, 652 n.1, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992). If a defendant can demonstrate a "presumptively prejudicial" delay, he or she must still establish that "'on balance, [the] four separate factors weigh in his favor.'" *Hall*, 551 F.3d at 271 (quoting *United States v. Thomas*, 55 F.3d 144, 148 (4th Cir.1995)).

The delay between Petitioner's indictment and trial does not meet the nearly one-year threshold that many courts would apply. *See Doggett*, 505 U.S. at 652 n.1. Although, the Fourth Circuit has held that a delay of eight months between indictment and trial can be presumptively prejudicial in simple cases. *United States v. Burgess*, 684 F.3d 445, 452 (4th Cir. 2012). Assuming that the delay here warrants analysis of the remaining *Barker* factors, Petitioner's speedy trial claim still stumbles. First, the reason for the delay may be attributable to both parties. Defense counsel requested the continuances that delayed trial, but he blamed the prosecutor for those requests because he had not received adequate discovery. Moreover, the undersigned is unaware of any evidence provided by Petitioner to the first state habeas court demonstrating that the prosecutor deliberately attempted to delay trial. Second, contrary to Petitioner's contention, on review of the trial transcripts, it does not appear that defense counsel asserted Petitioner's speedy trial rights. Instead, defense counsel asked that the indictment be dismissed for discovery violations and defects in the grand jury proceedings. In fact, Mr. Smith testified at the state habeas corpus hearing that he did not raise the speedy trial issue because he needed time to investigate and prepare for trial.

The final factor to be considered by the court is the prejudice to Petitioner that accompanied the delay. "On this point, the Supreme Court has identified three defense

interests for consideration: (1) whether there was an oppressive pretrial incarceration; (2) the anxiety and concern suffered by the accused; and (3) the possibility that the defense was impaired." *Hall*, 551 F.3d at 272 (citing *Barker*, 407 U.S. at 532). Of these three interests, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532. As to the first prong, Petitioner asserts oppression in that he was unable to receive adequate medical care while incarcerated before trial. (ECF No. 27 at 76). As to the anxiety prong, Petitioner claims that he was very anxious and concerned as evidenced by respiratory problems that he developed while incarcerated pending trial. (*Id.* at 77). Finally, as to impairment of his defense, Petitioner avers that the State's withholding of discovery until shortly before trial hampered the preparation of his defense and that his incarceration prohibited him from preparing a defense. (*Id.*)

Petitioner's arguments as to prejudice are unconvincing. As for the first two prongs, his run-of-the-mill claims regarding oppression and anxiety are insufficient to support his position. As for the third and most important prong, Petitioner has not established that his defense was hindered by the delay. Petitioner was able to communicate with his attorney often while incarcerated and aid counsel in preparing a defense. Moreover, Petitioner has not alleged that his counsel was unable to obtain certain pieces of evidence because of his incarceration or that exculpatory evidence was lost, destroyed or unavailable as a result of pretrial delay. Finally, to the extent that any discovery violations did occur, a proposition that the first state habeas court was not convinced of, Petitioner's counsel had more time to prepare between the end of the first trial and the beginning of the second trial. *See* ECF No. 27, Ex. 6 at 5 (Mr. Smith stating before the second trial began that most of the arguments regarding discovery violations

were moot at that point).

In sum, Petitioner has not established that the four factors, on balance, weigh in his favor and that the state court's decision denying his speedy trial claim was contrary to, or an unreasonable application of, clearly established federal law. Thus, his claim is unsuccessful.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner has failed to establish that the state court's denial of his speedy trial claim was an objectively unreasonable application of, or contrary to, clearly established federal law. The undersigned additionally **PROPOSES** that the District Court **FIND** that Petitioner's pre-indictment delay claim has been procedurally defaulted and that Petitioner's claim related to prosecutorial misconduct before the grand jury and at trial is without merit. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground three of the petition.

### E. Brady Violation

In his fourth assignment of error, Petitioner asserts that the State violated its own discovery rules as well as the Supreme Court's decisions in *Brady* and *Napue* by withholding exculpatory information and failing to produce a videotape recording of an interview of with J.G.[25] (ECF No. 27 at 87). According to Petitioner, during the discovery process, trial counsel requested numerous documents from the prosecutor, including police reports, records from DHHR, and the prosecuting attorney's file. After waiting more than 100 days, counsel finally received the investigating officer's report. Other information trickled in slowly, with trial counsel having to file several motions to compel materials. Despite the fact that the victims had been placed in foster care, were

---

[25] Although Petitioner cites *Napue* in his heading, he does not explain how *Napue* applies to this claim.

interviewed by multiple state agency employees, and received therapy, few records of these encounters were provided to defense counsel. Consequently, Petitioner believes that records related to his case, including at least one videotaped interview with J.G., were suppressed by the State because they contain exculpatory information. (*Id.* at 91). In support of his theory, Petitioner emphasizes that many of the investigations performed by the state agencies required the completion of reports, and he would expect there also to be interviews and other records generated, but none were provided by the prosecution. Petitioner also specifically points to the mention of a recording in a court-appointed special advocate report authored by R.D. Hegwood wherein the author transcribed this statement by J.G.: "I had told friends about [Petitioner] sexually abusing me and one of them called the police. I think this is when they got me on video tape but no one did anything." (ECF No. 27, Ex. 2.4). Additionally, Petitioner claims that the State's record-keeping procedures were inadequate during its investigation into the abuse allegations. (ECF No. 27 at 89-90).

Under *Brady*, 373 U.S. at 87, a state violates a defendant's due process rights when it fails to disclose to the defendant "evidence favorable to an accused ... where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." "*Brady* suppression occurs [even] when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" *Youngblood v. West Virginia*, 547 U.S. 867, 869-70, 126 S. Ct. 2188, 165 L. Ed. 2d 269 (2006) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)). In analyzing *Brady* claims, the Supreme Court has explained:

> There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the

State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). The petitioner carries the burden to establish these three elements. *Fullwood v. Lee*, 290 F.3d 663, 685 (4th Cir. 2002).

Addressing Petitioner's arguments in reverse order, he contends that he never received certain records related to agency investigations into the children's allegations. (*Id.* at 90-91). However, Petitioner has not established that these records ever existed. Instead, he opines as to how a child abuse investigation should be performed and what materials should be prepared during that investigation. [26] Thus, Petitioner's claim relies on documents that he *believes* should been created, but not on documents that he can show *actually were created*. The failure of State workers to record interviews or complete their written records in the manner that Petitioner interprets the statute to require does not give rise to a claim under *Brady*. Moreover, the Supreme Court has declared that *Brady* only concerns exculpatory evidence and does not create "a general constitutional right to discovery in a criminal case." *Gray v. Netherland*, 518 U.S. 152, 168, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996). Thus, to succeed on this claim, Petitioner must not only demonstrate that evidence was withheld, he must show that the evidence

---

[26]Petitioner avers that West Virginia law requires written notes to be taken during a child abuse investigation, and he cites W. Va. Code § 49-6A-5 in support of his position. That statute provides:

(a) Reports of child abuse and neglect pursuant to this article shall be made immediately by telephone to the local state department child protective service agency and shall be followed by a written report within forty-eight hours *if so requested* by the receiving agency. The state department shall establish and maintain a twenty-four hour, seven-day-a-week telephone number to receive such calls reporting suspected or known child abuse or neglect.

(b) A copy of any report of serious physical abuse, sexual abuse or assault shall be forwarded by the department to the appropriate law-enforcement agency, the prosecuting attorney or the coroner or medical examiner's office. All reports under this article shall be confidential. Reports of known or suspected institutional child abuse or neglect shall be made and received as all other reports made pursuant to this article. (Emphasis added).

was exculpatory. Mere speculation is insufficient to meet that burden.

Petitioner's claim regarding the video recording similarly founders. Prior to Petitioner's first trial, the prosecutor stated that he had been unable to locate any videotaped interview of J.G. and he had made inquiries about the videotape to the agencies that would likely have made such a videotape. (ECF No. 27, Ex. 3 at 31). Before Petitioner's second trial, the prosecutor again stated that he could not find any videotape, and a videotape was "not in the possession of any agency that [the prosecutor's office] even could be considered to loosely supervise or have control over." (ECF No. 27, Ex. 6 at 7). In addressing this claim, the first state habeas court held that Petitioner failed to show that the alleged videotaped interview contained any exculpatory information and failed to show that he was prejudiced by the State's failure to disclose the videotape, assuming it exists. (ECF No. 27, Ex. 5 at 18). This decision was neither contrary to, nor an unreasonable application of, federal law.

First, Petitioner again fails to show that any videotaped interview actually existed. *See United States v. Richards*, 314 F. App'x 522, 525 (4th Cir. 2008) (stating *Brady* claim lacked merit where defendant did not substantiate that the withheld evidence even existed). Second, Petitioner has not established that the videotape contained any exculpatory or impeaching information. While Petitioner insists that the videotape must contain exculpatory information because it was suppressed by the State, that type of circular logic is wholly unconvincing. Finally, Petitioner has not shown that the videotape was suppressed by the State and that he was prejudiced by any failure to disclose the videotape. *See United States v. Agurs*, 427 U.S. 97, 109-10, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not

establish 'materiality' in the constitutional sense.").

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner has failed to establish that the state court's denial of his claim related to the alleged videotape and record was an objectively unreasonable application of, or contrary to, clearly established federal law. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground four of the petition.

### F. Prosecutorial Misconduct – Improper Questioning and Argument

Petitioner also asserts that his Fifth, Sixth, and Fourteenth Amendment rights were violated when "the prosecutor committed misconduct by posing improper and inflammatory questions to Petitioner and by making improper arguments." (ECF No. 27 at 96). Specifically, Petitioner points to the prosecutor's questioning related to whether Petitioner had anyone available to "back up" his story that J.G. was in daycare during the time that she alleged the abuse occurred.[27] (*Id.* at 96; ECF No. 27, Ex. 6 at 112). Petitioner also insists that the prosecutor made "prejudicial comments" when asking the

---

[27] The colloquy went as follows:

Prosecutor: Now you don't have anybody here today from the day care center to testify that [J.G.] was there, do you?

Petitioner: No sir, I don't. Her mother is the one that carried her there, and that's the only one that I ever know of other than the child care center.

Prosecutor: But there's nobody here to back up your story, is there?

Petitioner: Is her mother here?

Prosecutor: There's nobody here today that you brought to back up your story, is there?

Petitioner: No, sir.

Prosecutor: About the day care?

Petitioner: No, sir.

(ECF No. 27, Ex. 6 at 112).

jury during closing argument why the children would concoct the abuse allegations and that the prosecutor improperly summarized the burden of proof when he stated that the jury could convict Petitioner based on the victims' uncorroborated testimony if the jury did not find their testimony "inherently incredible." (*Id.*; ECF No. 27, Ex. 6 at 166, 169-70).

Petitioner raised this claim on direct appeal to the WVSCA, citing only to West Virginia precedent on the issue. (ECF No. 27, Ex. 8). The WVSCA refused his petition for appeal. (*Id.*) "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85. Where a state court has summarily denied a petitioner's appeal, the federal court on habeas review "must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court.]" *Id.* at 786. A petitioner will satisfy the unreasonable application portion of section 2254(d)(1) "only by showing that 'there was no reasonable basis'" for the state court's decision. *Pinholster*, 131 S. Ct. at 1402 (quoting *Richter*, 131 S. Ct. at 784).

In addressing improper comments by prosecutors, the Supreme Court instructed that "the relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 180, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974));

*see also Parker v. Matthews*, ____ U.S. ____, 132 S. Ct. 2148, 2153, 183 L. Ed. 2d 32 (2012) (recognizing that *Darden* is clearly established federal law under AEDPA relevant to claim of improper comments by prosecutor). The Fourth Circuit has explained that, in analyzing a claim related to a prosecutor's purported improper comments, a court should look to a number of factors, including "(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters [; ] ... (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel [;] ... and (6) whether curative instructions were given to the jury." *United States v. Baptiste*, 596 F.3d 214, 227 (4th Cir. 2010) (quoting *United States v. Wilson*, 135 F.3d 291, 299 (4th Cir.1998)) (ellipses in original).

Assuming that the comments were improper, a precondition that is questionable here, Petitioner has not demonstrated that the questions and comments so infected his trial with unfairness as to deny his right to due process. The remarks were relatively isolated, and the evidence of Petitioner's guilt adduced through the victims' testimony was sufficiently strong. The prosecutor's comments were not related to extraneous matters, and they were in response to both Petitioner's testimony and arguably in response to defense counsel's opening remarks suggesting that the children may be lying, but he did not know, and did not have to prove, why. (ECF No. 27, Ex. 6 at 42). Finally, the jury was instructed that Defendant was presumed innocent and that the prosecutor must prove his case beyond a reasonable doubt. (*Id.* at 117-18). The court reminded the jury that the burden of proof "never shifts to the defendant; for the law

never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence." (*Id.* at 118).

Even without the application of AEDPA deference, under the Fourth Circuit's test for reversal based on improper comments by the prosecutor, Petitioner's claim does not warrant relief. Yielding to the AEDPA's mandate makes Petitioner's claim all the weaker. Additionally, Petitioner has failed to cite any clearly established law from the Supreme Court in support of his position. Instead, Petitioner relies on a number of out-of-jurisdiction cases where federal courts of appeals have taken up the issue on direct appeal with facts dissimilar to those present here. (ECF No. 27 at 97-98).

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner has failed to establish that the state court's denial of his claim related to improper comments and arguments by the prosecutor was an objectively unreasonable application of, or contrary to, clearly established federal law. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground five of the petition.

### G. Double Jeopardy

In his sixth assignment of error, Petitioner argues that his Fifth and Fourteenth Amendment rights were violated when he was retried on the same charges following a mistrial declared without the requisite manifest necessity. (ECF No. 27 at 99). Petitioner insists that the trial court erred by declaring a mistrial during his first trial instead of allowing the jury to take a break for the night and return to deliberations the following day. (*Id.* at 102-04). He argues that the trial judge declared a mistrial primarily because he had plans to travel and could not be available the next day. Therefore, even though the jury requested an overnight recess and may have been able to deliberate to a verdict

once refreshed, the judge made the premature decision to dismiss the jury. Petitioner asserts that although the judge's travel plans "may have been of considerable importance ... they were not sufficient to overcome Petitioner's 'valued right to have his trial completed by a particular tribunal.'" (citing *Arizona v. Washington,* 434 U.S. 497, 503, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). Petitioner further claims that the trial court incorrectly refused to provide the jury with the evidence that they requested during deliberations. (*Id.* at 104).

As discussed above, Petitioner's double jeopardy claim has been procedurally defaulted. Thus, the undersigned need not reach the merits of the issue.[28]

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner's double jeopardy claim was procedurally defaulted. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground six of the petition.

---

[28] Nonetheless, the undersigned notes that Petitioner's double jeopardy claim indeed lacks merit. "When a judge discharges a jury on the grounds that the jury cannot reach a verdict, the Double Jeopardy Clause does not bar a new trial for the defendant before a new jury." *Renico v. Lett,* 559 U.S. 766, 773, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010); *see also Blueford v. Arkansas,* ___ U.S. ___, 132 S. Ct. 2044, 2052, 182 L. Ed. 2d 937 (2012) (recognizing that deadlocked jury is "classic basis" for establishing manifest necessity to declare mistrial and allow later trial on same charge). The decision to declare a mistrial is left to the "broad discretion" of the trial judge, and such decisions are accorded considerable deference by a reviewing court. *Renico,* 559 U.S. at 774. Further, a trial court is not required "to consider any particular means of breaking the impasse" before declaring a mistrial because of a deadlocked jury. *Blueford,* 132 S. Ct. at 2052. Here, the trial judge twice instructed the jury to keep deliberating after the foreperson sent notes out informing the judge that the jury was at an impasse. After receiving the third note describing deadlock, the trial judge asked the foreperson if the jury was "hopelessly deadlocked." (ECF No. 27, Ex. 4 at 58). The foreperson responded affirmatively and also stated that further deliberations would not be fruitful. (*Id.*) It was not until that point that the judge declared a mistrial. Petitioner's argument that the jurors' fatigue and the judge's purported impatience did not allow a verdict to be reached is highly speculative. The record reflects that the jurors was instructed to keep deliberating after the note related to their tiredness was given to the judge, and the undersigned has no reason to doubt that the jury did so. It was not until later, and after further deliberations, that the jury insisted they were at an impasse. Finally, Petitioner's contention regarding the items requested by the jury is unavailing. The letters requested by the jury were never admitted into evidence, and Petitioner has failed to show that it is typical trial procedure in West Virginia to give the jury a transcript of in-court witness testimony for use in deliberations.

### H. Sufficiency of the Evidence

In his seventh claim, Petitioner contends that "the evidence record could not reasonably support a finding of guilt beyond a reasonable doubt." (ECF No. 27 at 108). Petitioner asserts that the victims' testimony was inherently unreliable based on a number of records and reports regarding the allegations, affidavits created post-trial, studies related to child sexual abuse allegations, and standards for investigating sexual abuse cases. (*Id.* at 108-113). He insists that if he had abused the victims nearly every day as they alleged, then other persons would have noticed or the victims would have required medical treatment because of the abuse. (*Id.* at 115). Petitioner also points out that no physical evidence of sexual abuse was presented to the jury. (*Id.* at 117).

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a [state] criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). "To determine whether this due process right has been violated, the appropriate inquiry before the passage of AEDPA was a straightforward question of whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Now, under the AEDPA ... we inquire whether a state court determination that the evidence was sufficient to support a conviction was an objectively unreasonable application of [the standard enunciated in] *Jackson*." *Williams v. Ozmint*, 494 F.3d 478, 489 (4th Cir. 2007) (internal citations and quotations omitted).

The first state habeas court considered Petitioner's sufficiency of the evidence position. (ECF No. 27, Ex. 5 at 13-15). The court wrote:

> [J.G.] was very explicit in testifying and documenting for the jury that,
> starting when she was about 5 years old, the Defendant sexually
> assaulted her with both his finger and his penis hundreds of times, and
> that he ". . . beat [J.G.] every day, it was an everyday thing, nonstop."
> [J.G.] further testified that the Defendant would send her brother
> [M.W.] out to walk the dog so the Defendant while these events
> occurred.
>
> [M.W.] testified that, starting when he was around 11 years old, the
> Defendant would fondle his genitals and penis, that he and the Defendant
> engaged in oral and anal sex, that the Defendant had physically abused
> him, and that he had seen the Defendant physically abuse his mother
> and sister. He further testified that the Defendant would tell him to go
> out and walk the dog on numerous occasions, that his sister would
> remain in the house, and that once he tried to return and found the
> doors locked and the windows shut so he wouldn't see anything.

(*Id.* at 10). The state court went on to hold:

> The Court has reviewed the trial transcripts and the full record below
> in a light most favorable to the prosecution and finds that there was
> sufficient evidence from which the jury could find guilt beyond a
> reasonable doubt.

(*Id.* at 15).

The undersigned is not convinced that the state habeas court's decision was

contrary to, or an unreasonable application of, clearly established federal law. First,

it should be noted that much of the evidence relied on by Petitioner in support of

his argument was not before the jury, and as such, that evidence has no bearing on

this claim. Second, the evidence before the jury was sufficient to support

Petitioner's conviction. Both J.G. and M.W. testified as to specific instances of

sexual abuse and that the abuse occurred repeatedly over a number of years.[29] Both

children also testified that Petitioner would lock the doors and close the window

blinds prior to the abuse in order to keep others from knowing that the abuse was

---

[29] In West Virginia, "[a] conviction for any sexual offense may be obtained on the uncorroborated
testimony of the victim, unless such testimony is inherently incredible, the credibility is a question for the
jury." Syl. Pt. 5, *State v. Beck*, 286 S.E.2d 234, 236 (W. Va. 1981).

occurring. M.W. recalled a specific instance where he attempted to gain access to the house while Petitioner and J.G. were alone, but the door was locked and the windows were shut. Furthermore, and recognizing that Petitioner had no burden to present such evidence, there was insufficient testimony for the jury to glean any motive for fabrication by the victims. The jury must have found the victims' testimony to be credible. Third, J.G.'s testimony comported with the medical evidence adduced at Petitioner's trial. Dr. Kelly testified that "in studies of legally proven cases of sexual abuse, the majority of patients have no evidence of sexual abuse." (ECF No. 27, Ex. 6 at 48). Dr. Kelly also stated that "fingers and objects can be entered into the vagina, [and] pass the hymen without creating any trauma to the hymen." (*Id.*) Dr. Kelly's testimony established for the jury that sexual abuse does not necessarily result in physical scaring or permanent injury, which conflicts with Petitioner's current lay opinion that the lack of physical evidence renders J.G.'s testimony inherently incredible.

For Petitioner to prevail on this claim, he must show that the state court's conclusion was not only wrong, it was unreasonable. *Ozmint*, 494 F.3d at 489. However, the state habeas court was not unreasonable in concluding that when the evidence before the jury is viewed in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *See Jackson*, 443 U.S. at 315.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner has failed to establish that the state court's decision on his sufficiency of the evidence claim was an objectively unreasonable application of, or contrary to, clearly established federal law. Accordingly, the undersigned

**RECOMMENDS** that Respondent be granted summary judgment on ground seven of the petition.

### I. Excessive Sentence

Petitioner claims that his minimum sentence of forty-five years imprisonment is excessive given his age. (ECF No. 27 at 118). Because he was sixty-one years old at the time of sentencing, Petitioner avers that he was effectively given a life sentence. (*Id.*) Petitioner claims his sentence is unjust because he had no prior felony convictions at the time of sentencing, the evidence against him at trial was very weak, and he maintains his innocence. (*Id.*) However, aside from the Eighth Amendment, Petitioner fails to cite a single authority to support his position.

The first state habeas court held that Petitioner's sentence did not shock the conscience of the court given the number of allegations and convictions of sexual abuse and given Petitioner's careful planning in carrying out the abuse. (ECF No. 27, Ex. 5 at 12). Additionally, the circuit court concluded that Petitioner's sentence was "proportionate and comparable to other sentences in similar convictions of sexual offenses against minor children." (*Id.* at 13) (citing cases from West Virginia supporting conclusion).

The Eighth Amendment prohibits the infliction of "cruel and usual punishment." U.S. Const. amend. VIII. In *Lockyer v. Andrade*, 538 U.S. 63, 72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003), the Supreme Court recognized that its "thicket of Eighth Amendment jurisprudence" established one clearly established principle: a sentence for a term of years may be challenged for gross disproportionately in a § 2254 proceeding. However, the Court acknowledged that the framework for analyzing such a claim was "unclear" and that the principle was only applicable in the "'exceedingly rare' and 'extreme' case."

*Id.* (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment)).

Reviewing the facts of this case and the statutes applicable to Petitioner's actions, the undersigned cannot conclude that Petitioner's sentence is grossly disproportionate to the convictions forming the bases for his sentence. Petitioner was ultimately convicted of three counts of sexual assault in the first degree, two counts of sexual assault in the second degree, two counts of sexual abuse by a parent of a child, and five counts of incest. (ECF No. 7, Ex. 3). At the time of Petitioner's sentencing, first-degree sexual assault was punishable by a minimum of fifteen years imprisonment and a maximum of thirty-five years imprisonment, W. Va. Code § 61-8B-3(b); second-degree sexual assault was punishable by a statutory minimum of ten years imprisonment and a maximum of twenty-five years imprisonment, *id.* § 61-8B-4(b); sexual abuse by a parent was punishable by a minimum of five years imprisonment and a maximum of fifteen years imprisonment, *id.* § 61-8D-5(a);[30] and incest was punishable by a minimum of five years imprisonment and a maximum of fifteen years imprisonment, *id.* § 61-8-12(c). Petitioner's sentences were within the applicable ranges set by the state legislature, and federal courts should be reluctant to second-guess the punishments that a state legislature deems appropriate for a given criminal offense. *See Lockyer*, 538 U.S. at 76. In addition, as the state habeas court pointed out, Petitioner's sentence is comparable to other sentences for similar offenses. (ECF No. 27, Ex. 5 at 12-13).

Finally, the facts adduced at trial demonstrate that he repeatedly sexually abused

---

[30] Petitioner was sentenced to a minimum of one year imprisonment and a maximum of five years imprisonment on the sexual abuse by a parent convictions. (ECF No. 7, Ex. 3). It is unclear from the record why Petitioner was sentenced to these terms of imprisonment. That sentence applies to parents who "knowingly procure another person to engage in or attempt to engage in" sexual intercourse or contact with a child that is under the age of sixteen and under the care of the parent, W. Va. Code § 61-8D-5(b), and Petitioner was convicted of personally abusing the children.

his two minor children over a number of years. Petitioner's case does not strike the undersigned as one of the exceedingly rare cases where relief is warranted under the Eighth Amendment because Petitioner's sentence was not grossly disproportionate to the offenses for which he was convicted. Accordingly, the state habeas court's court conclusion that Petitioner's sentence was proportionate is not contrary to, or an unreasonable application of, federal law.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner has failed to establish that the state court's conclusion that his sentence was proportionate was an objectively unreasonable application of, or contrary to, clearly established federal law. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground eight of the petition.

### J. Juror Issue

In his original federal habeas petition, Petitioner argued that his Sixth Amendment right to a fair and impartial jury was violated because "one of the jurors seated in Petitioner's trial was related to a Wayne County deputy sheriff." (ECF No. 2 at 12). Petitioner stated that "due to minor incidents within the Petitioner's neighborhood, he did not have a good relationship with law enforcement in the area." *Id.* Petitioner averred that because of this relationship, the juror could not have been impartial.

In his subsequent memorandum in support of his amended habeas petition, Petitioner asserts that he withdraws this claim. (ECF No. 27 at 120). As such, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner has abandoned this claim. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground nine of the petition.

- 64 -

### K. Ineffective Assistance of Appellate and State Habeas Counsel

As his tenth claim for relief, Petitioner alleges ineffective assistance of both appellate counsel and state habeas counsel. As concluded above, Petitioner's claim regarding the effectiveness of his appellate counsel has been procedurally defaulted, and the undersigned need not address the merits of a procedurally defaulted claim. As for Petitioner's ineffective assistance of state habeas counsel claim, his argument is foreclosed by the very statute he seeks relief under. Section 2254(i) provides that ineffective assistance of counsel during state habeas proceedings cannot be a ground for relief in a § 2254 proceeding. Accordingly, Petitioner's claim fails.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner's claim as to ineffective assistance of appellate counsel is procedurally barred and his claim as to ineffective assistance of state habeas counsel is not an appropriate ground for relief. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground ten of the petition.

### L. Cumulative Error

In his final assignment of error, Petitioner argues that he was "prejudiced by each of the errors listed above ... such that Petitioner's trial proceedings were fundamentally unfair." (ECF No. 27 at 133). Petitioner offers no facts or case law in support of his final argument, only a two sentence statement of error. (*Id.*) Accordingly, Petitioner's claim is insufficiently pled. He also failed to present this claim on direct appeal and to the first state habeas court. Moreover, the claim lacks merit.

In a federal habeas proceeding, "[t]he petition ... shall specify all the grounds for relief which are available to the petitioner . . . and shall set forth in summary form the

facts supporting each of the grounds thus specified." Rule 2(c), Rules Governing Section 2254 Cases. Petitioner failed to set forth the facts supporting this claim in his memorandum. Assuming that Petitioner meant to incorporate the facts contained throughout his memorandum, the claim still fails because the undersigned has not found any error, other than possibly the harmless error of his trial counsel to lodge certain objections at his second trial. However, any harmless errors did not collectively prejudice Petitioner to an extent that warrants relief. *See Fisher v. Angelone*, 163 F.3d 835, 853 n.9 (4th Cir. 1998).

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner has failed to establish that any cumulative error exists warranting relief. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground eleven of the petition.

## V.   <u>Proposal and Recommendations</u>

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** as follows**:**

1. Petitioner's Motion to Withdraw, without prejudice, his motions and claims for damages and other relief, (ECF No. 73), be **GRANTED,** and his motions and claims for damages and other relief, (ECF Nos. 60, 62, 65, 70, 71, & 72), be **DENIED**, without prejudice, as withdrawn;

2. Respondent's Motion for Summary Judgment (ECF No. 7) be **GRANTED**;

3. Petitioner's Petition for a Writ of Habeas Corpus by a Person in State Custody (ECF No. 2) be **DENIED**; and

4. That this action be **DISMISSED, with prejudice** as to the Petitioner's Petition for a Writ of Habeas Corpus by a Person in State Custody (ECF No. 2) and **without prejudice** as to Petitioner's motions found at ECF Nos. 60, 62, 65, 70, 71, & 72; and that this action be removed from the docket of the court.

The parties are notified that this "Proposed Findings and Recommendations" is

hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Petitioner shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Petitioner, Respondent, and any counsel of record.

**FILED:** October 9, 2014

Cheryl A. Eifert
United States Magistrate Judge